Argued May 3, 1971, affirmed January 19, 1972

MAY, *Appellant, v.* BROUN ET AL, *Respondents.*

492 P2d 776

*J. N. Hershberger,* Hermiston, argued the cause for appellant. With him on the briefs were Morrison & Hershberger, Hermiston.

*Thomas S. Moore,* Portland, argued the cause for respondent Rasmussen. *George H. Corey,* Pendleton, argued the cause for respondent Broun. With them on the brief were Morrison & Bailey, William H. Morrison, and George M. Joseph, Portland, and Corey, Byler & Rew, Pendleton.

Before McAllister, Presiding Justice, and Denecke, Holman, Howell and Bryson, Justices.

HOLMAN, J.

This is an action for damages arising out of alleged negligent acts by defendant doctors while they were performing a hemorrhoidectomy. From a judgment of involuntary nonsuit, plaintiff appealed.

One of the defendants was a general practitioner and plaintiff's regular physician. He associated the other defendant, a surgeon, for the purpose of performing the operation while he assisted.

As part of the operative procedure, an electrical instrument was used to cauterize blood vessels. This machine, which sat about six feet from the operating table, was connected by a cord to a small applicator, about the size and shape of a pen, which contained a needle that actually cauterized the vessels. An electrode, which is a flat, metal, rubber-backed plate about nine inches by seven inches in size, had been placed so that it was under the chest of the plaintiff as she lay face down on the operating table. The electrode was also connected with the machine. There was a pedal on the floor for the surgeon to press with his foot to activate the electrical current. By virtue of the electrode, the patient's body became a part of an electrical circuit.

Plaintiff's surgery was the fifth operation which defendants had performed that day, and they had used the machine in the prior operations. The first two times the surgeon attempted to use the applicator on plaintiff it did not deliver sufficient heat to cauterize the vessels properly, and both times the surgeon requested the circulating nurse to check the machine. Thereafter, it worked satisfactorily and the operation was completed. After the operation, it was found that plaintiff was burned where she had contact with

the electrode. There is no evidence as to the cause of the injury, other than the testimony of the defendants, who were called as witnesses by plaintiff, to the effect that the machine had been hooked up incorrectly. It is apparent that they had no personal knowledge of this fact and were relying upon what they had been told by hospital employees. They testified also that it was possible for such a burn to have been caused by a malfunction of the machine.

Plaintiff settled a claim against the hospital and the circulating nurse and gave them a covenant not to sue. None of the hospital employees were called as witnesses. There is no testimony concerning the manner in which the machine was hooked up incorrectly, if such was the case, or whether it was possible, practical, usual, or safe medical practice for a surgeon to check the machine and the patient's relation to it before its actual use. One of the defendants did testify that there was no way of testing the machine without actually using it after plaintiff was connected to it.

The principal assignments of error involve the propriety of granting the involuntary nonsuit and whether the doctrine of *res ipsa loquitur* is available to plaintiff under the facts of this case. As a result, it is necessary to elaborate the known circumstances surrounding this injury and what the evidence discloses concerning the manner of preparation in the hospital in question for an operation such as the one performed on plaintiff. Even though there is no testimony concerning the details of preparation in the present case, the defendants testified as to the preparation which usually was made, and their testimony was not contradicted.

All equipment used in the operating room, in-

cluding the electrical cauterizer, was owned and cared for by the hospital. All persons in the operating room, with the exception of the anesthetist and the two defendants, were selected and paid by the hospital. Besides the anesthetist and the two defendants, there were present in the operating room a scrub nurse, a circulating nurse, and a nurse's aide. These persons were subject to the supervision of the chief surgeon during the operation.

After completion of the operation immediately prior to the one under consideration, the defendants retired to a doctors' lounge, or dressing room, to rest and to await preparation of the operating room for the surgery upon plaintiff. Usual procedure is that the operating room is cleaned, all used equipment is removed, and a new sterile pack is brought in and prepared for use. Those items that are required to be sterile, because of possible contact with the doctors or with the patient's operative area, are handled by the scrub nurse, who is subjected to sterile technique before she enters the operating room. Included in the sterile pack are the cauterizer applicator and the cord to which it is connected.

The patient, after being brought into the operating room on a wheeled cart, is anesthetized while he is still lying on the cart. Thereafter, the patient is removed from the cart and is placed face down, with his knees doubled up under his abdomen. His chest is placed on the electrode, and the patient is, then, completely draped with sterile cloths except for a small opening at the operative area. The cauterizer applicator is pinned to the outside of the sterile draping, where it can be reached by the surgeon as need dictates. The doctors are notified when these preparations for the operation will be completed in suffi-

cient time for them to commence scrubbing their hands and arms. After scrubbing for ten minutes, they enter the operating room while they hold their hands and arms before them to avoid contamination. There they are met by the scrub nurse, who places sterile gowns and gloves upon them. The operation then commences.

One of the defendants testified that he knew nothing about the cauterizing machine and had no idea how it functioned. The chief surgeon testified that he had used such a machine for many years, but he had never had any training concerning its mechanical operation. He knew how the machine functioned, but he had never set one up for an operation. He further testified that it was the circulating nurse's duty to set the machine up for the operation.

Plaintiff relies on the doctrine of *res ipsa loquitur* as applied in *Nicholson v. Sisters of Charity,* 255 Or 251, 463 P2d 861 (1970), and *Mayor v. Dowsett,* 240 Or 196, 400 P2d 234 (1965). *Mayor* authorized the use of the doctrine in medical malpractice cases and set forth the following prerequisites to its application:

> " '* * * (1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff. * * *' Prosser, Law of Torts (2d ed) 201-202, § 42." 240 Or 196 at 214.

In the present case, the inference can undoubtedly be drawn that plaintiff was injured as the result of someone's negligence other than her own. The principal question is whether, under the evidence, it can be said that the person or instrumentality which caused the

injury was sufficiently within the control of the defendants for the doctrine to apply to them.

In *Mayor,* the plaintiff became permanently paralyzed after having been administered a spinal anesthetic. In *Nicholson,* a safety pin was left in plaintiff's abdomen upon the completion of an operation. *Res ipsa loquitur* was used in both cases to sustain a judgment against the defendants. Plaintiff here particularly relies upon *Nicholson* because, in that case, the defendants unsuccessfully made the same contention that is being made by the defendants in this case. In *Nicholson,* defendants contended that *res ipsa loquitur* was not applicable because it was the nurse's duty to take care of and to account for the safety pins and that the doctors, therefore, lacked exclusive control of the agency causing the injury. The only safety pins in the operating room were those which came attached to the ends of rubber tubing sections which were used by the doctors to press aside internal organs within the operative cavity so that access could be gained to the primary operative area.

The application of *res ipsa loquitur* in *Nicholson* was based upon the premise that, even if the nurse was negligent, the pin would not normally have found its way into the body cavity unless the surgeons were also negligent, because they had exclusive actual control of everything that went in and came out of the body cavity regardless of who might have had the duty to take care of and to account for the pins. It was based upon the premise that the pin normally would not have been left in the body cavity without the personal negligence of the doctors.

Before the doctrine of *res ipsa loquitur* would apply to defendants, one of two situations would have

to exist. It would have to be shown that it was more probable than not that either the defendants were personally negligent or someone was negligent for whose actions defendants were responsible under the doctrine of *respondeat superior*.

■ A fair analysis of the evidence relating to the manner in which plaintiff was injured leads only to the conclusion that her injury was caused by a machine which was defective, or which was incorrectly hooked up in relation to plaintiff, or which was improperly operated.

It is our conclusion that the evidence is insufficient to establish a jury question concerning defendants' personal negligence. The evidence does not show whether the machine can be tested by a surgeon for defects. It does not show whether surgeons, in the exercise of reasonable care, normally check the manner in which a machine is hooked up in its relation to a patient or even if such a check is practical. Neither does it show that it is logical to expect surgeons, while they are cauterizing severed blood vessels, to be several feet away overseeing the operation of a machine.

Plaintiff contends it was the duty of defendants, at the commencement of the operation when the machine failed to function properly, to suspend the operation and to determine the difficulty before they proceeded further. This argument necessarily presupposes that plaintiff's injury was occasioned by defendants' continuing to operate after the machine was checked by the nurse and functioned properly. It is just as reasonable to assume that plaintiff was burned at the time the machine failed to function upon its initial use as it is to assume that she was burned when it did function.

The next, and more difficult, step is the determination whether defendants are responsible on a *respondeat superior* basis for the actions of the circulating nurse. The evidence justifies the drawing of an inference that either she hooked up the machine incorrectly in its relation to plaintiff or that she operated it improperly during the surgery.

We start out with the nurse being an employee of the hospital which selects, trains and pays her. It is usual, and there is no evidence to the contrary in this case, that the surgeon arranges for the admission of the patient into the hospital and that the hospital then contracts with and bills the patient for the payment of any services which the hospital furnishes, including the cost of all surgical services, with the exception of the personal services of the surgeon. If there were nothing more, we would say that a surgical nurse was the employee and agent of the hospital. However, depending upon the circumstances, the nurse can become a loaned employee in the service of the surgeon. The difficulty is in determining at what point and under what circumstances this metamorphosis takes place.

■ *Respondeat superior* is usually determined by the right of the claimed principal to control the negligent actor. There is no doubt that a surgeon has the right to control the employees of the hospital, including the nurse, in the preparation of the hospital room and of the patient for surgery, as well as in the carrying out of their functions during surgery. However, in a situation where the nurse is in the general employ of the hospital and is performing services for the hospital as well as for the surgeon, courts do not now usually hold that she changes from a general employee

of the hospital to a special employee of the surgeon until she is under the surgeon's direct supervision or control. See cases cited in Annotation entitled, "Surgeons—Nurse's Negligence," 12 ALR3d 1017 at 1021-1022. Thus, courts are now usually holding that the surgeon's responsibility for the hospital employee's negligence is limited to situations in which the negligence occurs during the course of the actual operation when the surgeon is present and that he is not responsible for pre- or post-operative procedures which it is usual for the hospital's employees to perform in the surgeon's absence.[⊙]

At one time some courts went to great lengths to attach *respondeat superior* liability upon surgeons because of the rule of charitable immunity which was usually applied to hospitals. The original "captain-of-the-ship" case, *McConnell v. Williams,* 361 Pa 355, 65 A2d 243 (1949), contained the following language:

> "* * * [I]f operating surgeons were not to be held liable for the negligent performance of the duties of those then working under them, the law would fail in large measure to afford a means of redress for preventable injuries sustained during the course of such operations." 65 A2d 243 at 247.

It is not presently necessary to go to such lengths in Oregon in order to find a defendant who has the ability to satisfy a judgment and to spread the loss because charitable immunity for hospitals has been

---

[⊙] Hallinan v. Prindle, 17 Cal App 2d 656, 62 P2d 1075 (1936); Sherman v. Hartman, 137 Cal App 2d 589, 290 P2d 894 (1955); Bria v. St. Joseph's Hospital, 153 Conn 626, 220 A2d 29 (1966); Nichter v. Edmiston, 81 Nev 606, 407 P2d 721 (1965); Clary v. Christiansen, 54 Ohio L Abs 254, 83 NE2d 644 (Ohio App 1948); McCowen v. Sisters of Most Precious Blood, 208 Okla 130, 253 P2d 830 (1953); Meadows v. Patterson, 21 Tenn App 283, 109 SW2d 417 (1937); Wright v. Conway, 34 Wyo 1, 241 P 369, *reh den* 34 Wyo 42, 242 P 1107 (1925).

abolished.[9] It would probably be fair to say that the wave of cases holding surgeons liable on one theory or another has somewhat receded following the abandonment by many courts of the doctrine of charitable immunity for hospitals.

Changes have also been occurring in the confines of operating rooms. Surgeons are operating more and more in a highly mechanized environment wholly created by hospitals. Much highly technical equipment, now considered necessary, is furnished by the hospital and operated by personnel which the hospital hires and trains. As a result, in most instances, a surgeon cannot actually have direct supervision or control over such equipment and the persons who operate it even when he is present, if he is going to give the concentration and attention to the surgery which his patient has the right to expect.

There are only three cases which we have been able to find where patients were burned by the electrode of a cauterizer. Two resulted in the courts' refusing to hold the doctors liable. In *Bakal v. University Heights Sanitarium,* 302 NY 870, 100 NE2d 51 (1951), the plaintiff was burned as the result of failure of the nurses to apply ointment properly to the chest of plaintiff before placing her on the electrode. The trial court, 198 Misc 651, 99 NYS2d 814, dismissed the complaint as to the surgeon and ruled that there was no evidence of his negligence. The Appellate Division, 277 App Div 572, 101 NYS2d 385 (1st Dept.), and the Court of Appeals affirmed without discussing the question.

In *Clary v. Christiansen,* 54 Ohio L Abs 254, 83

---

[9] Hungerford v. Portland Sanitarium, 235 Or 412, 384 P2d 1009 (1963).

NE2d 644 (Ohio App 1948), one cauterizing machine, after having been inspected by the surgeon, was replaced with another by hospital personnel without their informing the surgeon of the change. The plaintiff was burned as a result of the substitution. The court held that the surgeon was not responsible, stating as follows:

> "We are of the opinion that the scrub nurse was not in any sense an employee of the defendant in the task of preparing the room preceding the actual beginning of the operation and that whatever negligence occurred in that connection cannot be attributed to him." 83 NE2d 644 at 645-46.

In the third case, *Monk v. Doctors Hospital,* 131 U.S. App D.C. 174, 403 F2d 580 (DC Cir 1968), the court held that there was sufficient evidence to go to the jury relative to the liability of both the nurse and the surgeon. There was evidence from which it could be found that the electrode was improperly placed against the body of the patient by the nurse when the doctor was not present. However, there also was evidence that the nurse asked the surgeon to check the propriety of the placement and that he did so. It was evident that the electrode was in such a position that the surgeon necessarily had notice of the manner of its placement. The surgeon also was shown to have had special knowledge of the cauterizing machine and that he had written a treatise on it. The court held that under such circumstances there was sufficient evidence of the surgeon's *personal* negligence to go to the jury. The court specifically did not pass upon the subject of whether there was sufficient evidence to support a finding that the nurse functioned as the surgeon's agent.

We hold that when technical equipment and the personnel to operate it are furnished by the hospital

to the surgeon and injury is caused by malfunctioning equipment or negligent operators, and it is not shown that the surgeon was personally negligent or that the circumstances were such that it was practical for him to exercise direct supervision or control over the machine or its operation, *respondeat superior* liability does not attach to the surgeon. There is no evidence in this case that indicates defendants had the ability, consistent with their duty to their patient, to supervise or control directly the machine or its operation. The following language from Mechem, Outlines of Agency § 466, n. 93 (4th ed 1952) would seem to be particularly applicable:

> "* * * [W]here the equipment is furnished by the general employer and requires special exercise on the part of the servant, so that it is unlikely that the special employer will do more than ask for particular results, the presumption that the general employer is liable remains strong * * *."

It may well be that the real basis for the application of *respondeat superior* is not control, actual or putative, but rather the negligent party's act of carrying forward the business of his principal. The motivating force may be the idea that the business should pay the cost of its negligent operation. See T. Smith, "Scope of the Business: The Borrowed Servant Problem," 38 Mich L Rev 1222 at 1248 (1940). Such a basis for *respondeat superior* initially points toward the liability of both hospital and surgeon because the operator of the equipment is simultaneously carrying on the business of both employers. The hospital is in the business of furnishing the facilities and personnel to the surgeon, and the surgeon is using them to operate on his patient. Also, both hospital and surgeon are normally capable of satisfying any judgment against

them and of spreading the cost of doing so. Therefore, there would be no choice between the two on that basis.

■ However, there is a policy reason for making a choice between the two employers whose business is being conducted and, in doing so, to choose the hospital as the one who should be responsible. Although no negligence of hospital may be pointed to in a specific case, any opportunities for prevention of like occurrences in the future primarily lie in the care with which equipment is maintained and with which personnel to operate it are selected and trained. These opportunities all lie within the realm of the activities and duties of the hospital; therefore, it is proper to place the burden of defective equipment and negligent operators upon it. The pressures to devise means to prevent future accidents should be placed upon those who best have it within their power to devise such means.

We hold that the doctrine of *res ipsa loquitur* has no application to this case because the instrumentality or person which caused the injury was not shown to have been sufficiently within the control of the defendants, or of someone for whose actions defendants were responsible, for the application of the doctrine, and that, without the application of such doctrine, there was insufficient evidence of the defendants' negligence to go to the jury.

We do not express any opinion as to the application of *res ipsa loquitur* in a situation where plaintiff, during an operation, has suffered an injury which cannot be traced to any specific person or piece of equipment and later brings an action against all who were within the operating room. *See Ybarra v. Spangard,* 25 Cal 2d 486, 154 P2d 687, 162 ALR 1258 (1944).

Plaintiff contends the trial court erred in failing to strike as hearsay that portion of defendants' testimony during which they stated that the machine was hooked up improperly. Because we have not treated the case as if this were the sole possible cause of plaintiff's injury, it is unnecessary to discuss the matter.

The judgment of the trial court is affirmed.

McALLISTER, J., concurring.

The majority holds that there was no showing that the surgeon had sufficient opportunity to exercise direct supervision and control over the operation of the machine which caused plaintiff's injury. I agree with that holding, and concur in the majority opinion except for the paragraph dealing with the hospital's superior opportunity to prevent injuries caused by negligent maintenance and operation of equipment. There was no evidence on that question, and the majority's statements are based on factual assumptions which I doubt are valid. In any event, these statements are unnecessary and unrelated to the holding and its rationale. Their only possible effect is future confusion and uncertainty as to the basis for our decision in this case.