567 A.2d 524

**Sylvester FRANKLIN, Jr.**

v.

**Shanker L. GUPTA, et al.**

**No. 940, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Jan. 3, 1990.

Certiorari Denied April 17, 1990.

348

Richard W. Winelander and Donald J. Katz, Lutherville, for appellant.

Angus R. Everton (Montedonico & Mason, Chartered, on the brief), Baltimore, for appellee, Herbert S.T. Lee.

Catherine A. Potthast (Patti Gilman West, C. Robert Loskot and Smith, Somerville & Case, on the brief), Baltimore, for appellees, Sergott and Church Hosp. Corp.

William F. Ryan, Jr., Robert Rider, Jr. and Whiteford, Taylor & Preston, Baltimore, on the brief, for appellee, Gupta.

Argued before WILNER and BISHOP, JJ., and JAMES S. GETTY, Judge of the Court of Special Appeals (retired), Specially Assigned.

WILNER, Judge.

This is a medical malpractice case. Appellant, an unfortunate soul with a host of physical and emotional problems, also developed carpal tunnel syndrome—a condition that causes pain in the wrist and muscle weakness in the hand. He consulted Dr. Shanker L. Gupta, a general surgeon, who recommended surgical treatment for that condition.

Surgery was scheduled at Church Hospital for 10:00 a.m. July 17, 1981. Dr. Herbert S.T. Lee, an anesthesiologist, and Gary J. Sergott, a certified registered nurse anesthetist, were assigned by the hospital to administer and monitor the anesthesia. Unfortunately, Dr. Lee was also scheduled to administer and monitor anesthesia to another patient in another operating room at the hospital at the same time. Dr. Lee chose to tend to the other patient, and so the actual administration and monitoring of the anesthesia to appellant fell to Nurse Sergott. As we shall see, things did not go as planned. The anesthesia administered by Nurse Sergott was not only not effective, but appellant suffered certain physical and emotional trauma from it, and the surgery was eventually cancelled.

As a result of this experience, appellant filed a claim with the Health Claims Arbitration Office against Dr. Gupta, Dr. Lee, Nurse Sergott, and the hospital. After an evidentiary hearing, the arbitration panel found no liability on the part of any of the defendants and entered an award in their favor. Appellant rejected the award and filed suit in the Circuit Court for Baltimore City.

After a *de novo* trial, the jury agreed with the arbitration panel that there was no liability on the part of Dr. Gupta, but it concluded that the other defendants *were* culpable. It returned a verdict in favor of Dr. Gupta but against Dr. Lee, Nurse Sergott, and the hospital in the amount of $375,000.

Appellant's 75% victory was short-lived. Believing that appellant had failed to show either the standards of care that were violated or that the violations shown were the

proximate cause of the injuries suffered by him, the court granted motions for judgment NOV filed by Lee, Sergott, and the hospital and entered judgment in their favor. Further declaring its judicial conscience shocked by what it regarded as "grossly excessive" damages, the court also conditionally granted motions by Lee, Sergott, and the hospital for a new trial unless appellant agreed to accept a remittitur of all but $50,000. The effective judgment was in favor of all four defendants and ended the case in the Circuit Court. The grant of a new trial as to Lee, Sergott, and the hospital was to become effective only if the judgments NOV were reversed on appeal and appellant refused to accept the remittitur. See Md. Rules 2–532(e); 2–533(c).

This appeal followed. Appellant complains that the court erred (1) in entering the judgments NOV, (2) in ordering the new trial in default of appellant accepting a $325,000 remittitur, and (3) in declining to give two requested jury instructions bearing on Gupta's liability.

We find merit in appellant's first complaint; the court erred in granting the judgments NOV. We find no reversible error in the other decisions. We therefore shall affirm the judgment in favor of Dr. Gupta, reverse the judgments in favor of the other three defendants, and remand the case for such further proceedings as may be required by the order conditionally granting a new trial.

## I. UNDERLYING FACTS

We mean no disrespect when we say that appellant was not a picture of health when he presented himself at the hospital on July 16, 1981—the day before his scheduled surgery. He had a history of syncope (temporary blackouts), asthma, emphysema, bronchitis, hyperthyroidism, chronic depression, and a nervous condition. He was also excessively—"morbidly"—obese; five feet, five inches tall, he weighed 295 pounds. He was permanently and totally disabled from employment and subsisted from social security disability benefits.

Dr. Lee, as we indicated, was designated by the hospital as the anesthesiologist for appellant's surgery, along with Nurse Sergott. Dr. Lee visited appellant on the afternoon of the 16th for an "anesthesia evaluation." Because of the patient's asthma, obesity, and hyperthyroidism, Dr. Lee recognized that appellant was a "high risk patient for anesthesia"; he therefore decided against a general anesthesia and opted instead for an axillary or brachial block.[1] He did not, however, determine which anesthetic to use or which, if any, analgesic to use. Nor did he, prior to the surgery, (1) record his evaluation in appellant's chart, (2) see appellant again, or (3) discuss the case in any way with Nurse Sergott. At 10:00 the next morning, Dr. Lee reported to the other operating room and had no further involvement with appellant until after the anesthesia administered by Nurse Sergott proved ineffective and a dispute arose between Nurse Sergott and Dr. Gupta as to what to do about it.

*Sans* any advice or direction from Dr. Lee and without any notes of Dr. Lee's evaluation in the medical record, Nurse Sergott examined appellant on the morning of the 17th, just before the surgery. He noted from his observations and from Dr. Gupta's notes that appellant was obese, asthmatic, and dyspneic (i.e., he had difficulty breathing). The last of these problems Nurse Sergott attributed to appellant's obesity and asthma, exacerbated by the fact that he was a heavy smoker. On the other hand, from the pre-operative tests that were done, it appeared that appellant's blood studies, electrocardiogram, blood pressure, heart rate, and chest x-ray were all normal. Nurse Sergott independently decided to use a brachial block; he decided, by himself, which drug to use for that purpose; and he also decided, by himself, what analgesic to use and how it was to be administered. The analgesic chosen by Nurse Sergott

---

1. An axillary or brachial block is designed to anesthetize the entire arm, but nothing more.

was Sublimaze—a synthetic narcotic analgesic listed as a Schedule II controlled dangerous substance.

Sergott administered the brachial block while appellant was in the "holding room." Just before administering that block, he gave appellant one cubic centimeter (cc) of the Sublimaze. As appellant was being wheeled into the operating room, Sergott gave him a second cc of Sublimaze, and about 10 minutes later he gave him a third cc of that drug.

At some point shortly after administering the third dose of Sublimaze, Nurse Sergott noticed that the block was "patchy"—i.e., "[t]he media flesh was not completely blocked on his hand." He wanted to give appellant another block, but Dr. Gupta insisted that he put appellant to sleep. Believing that general anesthesia was inappropriate and that, "being a surgeon, [Dr. Gupta] is not aware of anesthesia," Nurse Sergott decided to consult Dr. Lee who, of course, was in another operating room. Sergott summoned another nurse anesthetist—Ms. Belvay—went over appellant's vital signs with her, and then left to consult with Dr. Lee. Dr. Lee, then busy with another patient under anesthesia and unable to leave, agreed that appellant should be given another brachial block and not put to sleep.

When Nurse Sergott returned to the operating room with this confirmation, he found Nurse Belvay ventilating appellant with oxygen. It appears that, about 10 minutes after administration of the third dose of Sublimaze and while Nurse Sergott was conferring with Dr. Lee, appellant's breathing became shallow. Indeed, according to the medical record, he became cyanotic—i.e., his skin turned blue because of lack of oxygen in the body. He then became bradycardic (slow heartbeat) and had a period of asystole (his heart stopped beating entirely). Just how long the asystole lasted is unclear, in part because the critical entry on the medical record is smudged with ink and is therefore unreadable; there was evidence that it lasted from 10 seconds to two minutes. Appellant was promptly intubated and given Atropine and cardiopulmonary resuscitation, and

his heartbeat returned to normal. At that point, Dr. Lee appeared and instructed Dr. Gupta to cancel the surgery.

Appellant remained in the hospital until his discharge on July 21, 1981. He never did have the surgery on his wrist.

## II. JUDGMENTS NOV—LEE, SERGOTT, HOSPITAL

### A. *Governing Principles*

Preliminarily, we note that the hospital has conceded that Nurse Sergott was its employee; it is clear, then, that the hospital would be vicariously liable for any culpable negligence on Sergott's part. Our discussion of the evidence relating to Sergott, therefore, also applies to the hospital.

A plaintiff's burden in a medical malpractice case grounded on negligence was well-summarized in *Lane v. Calvert*, 215 Md. 457, 462–63, 138 A.2d 902 (1958):

"There is a presumption that the doctor [or other health care professional] has performed his medical duties with the requisite care and skill.... The burden of proof is on the plaintiff to show both a lack of the requisite skill or care on the part of the doctor and that such want of skill or care was a direct cause of the injury; and if proof of either of these elements is wanting the case is not a proper one for submission to the jury.... The ... degree of skill required is ... 'not the highest or greatest, but only such as is ordinarily exercised by others in the profession generally.' ...

It is well established by the case law in this State that the mere fact that an unsuccessful result follows medical treatment is not of itself evidence of negligence."

More specifically to the point in terms of this case, the Court in *Weimer v. Hetrick*, 309 Md. 536, 553, 525 A.2d 643 (1987), quoted with apparent approval this statement from *Waffen v. U.S. Dept. of Health & Human Services*, 799 F.2d 911, 915 (4th Cir.1986):

" 'The general principles which ordinarily govern in negligence cases also apply to medical malpractice claims under Maryland law. A *prima facie* case of medical

malpractice must consist of evidence which (1) establishes the applicable standard of care, (2) demonstrates that this standard has been violated, and (3) develops a causal relationship between the violation and the harm complained of.... As in any other case founded upon negligent conduct, the burden of proof in a medical malpractice claim rests upon the plaintiff.' "

*See also Johns Hopkins Hospital v. Genda,* 255 Md. 616, 620, 258 A.2d 595 (1969).

The precise issue before us, of course, is whether the trial court erred in entering the judgments NOV based on its perception that the evidence was insufficient to meet this tripartite test. We therefore must assume the truth of all credible evidence and all inferences of fact reasonably deducible from it tending to sustain appellant's contentions. If, in so doing, we find any legally relevant and competent evidence, however slight, from which the jury could rationally have found that test satisfied, we must reverse the judgments NOV. *See Impala Platinum v. Impala Sales,* 283 Md. 296, 389 A.2d 887 (1978); *McGarr v. Boy Scouts of America,* 74 Md.App. 127, 536 A.2d 728 (1988).

### B. *Evidence of Negligence—Standard of Care, Violation of Standard, Causation*

The principal witness testifying on appellant's behalf with respect to the relevant standards of care and their violation by Dr. Lee and Nurse Sergott was Dr. A. Terry Walman, who was associated with Johns Hopkins Hospital and was qualified as an expert in anesthesiology. Dr. Walman reviewed all of the relevant medical records pertaining to appellant and to what occurred on July 16 and 17, 1981. Based on this review, he found "five different areas in which the standard of care for patients such as [appellant] undergoing the procedures that were planned in July of 1981 ... were broken."

The *first* deficiency, he said, was that "the pre-operative evaluation was incomplete for a patient who presents like [appellant]." Given all of his other problems, appellant was

not a routine patient, but "[h]e was treated routinely as far as the pre-operative evaluation goes. The tests that were done were routine. The work-up that was done for him was routine." And that led Nurse Sergott to underestimate the actual risk.

The American Society of Anesthesiologists (ASA), Dr. Walman noted, has developed a five-category physical status designation. ASA II, he said, is the designation "for a person who has a few medical problems, all of which are well-compensated, and none of which really are so significant as to cause any impairment." ASA III "is for someone who has more complicated problems, multiple problems, all significant, *but are all thought to be well compensated at the time for surgery.*" (Emphasis added.) ASA IV "is someone who is multiple medical problems *not well compensated and therefore is at higher risk for anesthesia and surgery.*" (Emphasis added.)

Nurse Sergott evaluated appellant as ASA III; Dr. Walman assessed appellant as ASA IV. Noting appellant's massive obesity, Dr. Walman said that "[t]he proper medical workup" for such a person "involves a full pulmonary consultation work-up, and full cardiac consultation work-up, work-up of his liver, work-up of in this case fainting spells [i.e., the syncope], thyroid condition." Much of this, he stated, had not been done prior to the surgery. Yet "ASA classification depends upon the information that you have. You should have had more information, more information would have had him in the classification of ASA IV."

Dr. Walman went into considerable detail with respect to this point. An arterial blood gas test was *never* done, yet for "someone who presents a lung problem like [appellant], *it's mandatory, has to be done.*" (Emphasis added.) That test, he said, "would have made people much more aware of how sick he really is." Because these various tests had not been done, "they didn't know this patient well enough with the information they had to ... make a determination and take him to the operat[ing] room for any kind of anesthesia."

Finally, as to this point, Dr. Walman opined that, whenever a particular form of anesthesia, such as a brachial block, is planned, it may fail, and it is necessary to consider general anesthesia as a backup:

"If the operation was in mid course of the operation and ... the block failed, he will need to be taken care of, he needs pain relief. The best way would be to do general anesthesia. You have to be prepared to do a general. If you're afraid to, because you don't have enough information, then you need to stop and get the information."

The *second* deficiency, according to Dr. Walman, was the lack of any communication between Dr. Lee and Nurse Sergott. Earlier in his testimony, Dr. Walman stated that "the prevailing standards in the same or similar circumstances in 1981 demand that an anesthesiologist select the anesthesia, the agents, the mode of administration, to be used for the patient, and [that] it be recorded on the anesthesia chart." Expounding on this, Dr. Walman stated:

"If the anesthesiologist wasn't going to be the one for the next day, he should have communicated with someone, written a note in the chart....

If he thought that he was going to be the anesthesiologist to work with the nurse, then he should have ... written a note once again for the nurse to read, or at least talk to the nurse...."

The breach of this requirement was essentially conceded. Dr. Walman observed that "there was no communication in the chart, no written communication as to anything about the anesthesia evaluation by an anesthesiologist ... to anyone who might be administering anesthesia care." Apart from the lack of any written communication, "[h]e didn't talk to any other anesthesiologist, he didn't talk to the nurse anesthetist."

The *third* deficiency was succinctly stated by Dr. Walman:

"The third thing that falls below the minimum standard is the unavailability of the anesthesiologist to the patient. Dr. Lee has said that he was in ... [a]nother operating room, and unable to come and take care of his patient.

Well, if he was the responsible anesthesiologist ... then he should have been available ... to come to the patient. It's okay to work with nurse anesthetists, actually okay to cover two rooms taking care of patients, physically to each patient. But it's not okay to be tied up in a room. Yes, you can't leave and have a nurse anesthetist working under you, and I find that as breach of standard."

The *fourth* deficiency involved the administration of the Sublimaze. According to Dr. Walman, Sublimaze (or Fentanyl citrate) is a narcotic "100 to 150 times more potent than morphine." [2] Normally, he said, a three-cc dose would not be inappropriate, but for a patient like appellant, who already had breathing difficulty and was to be in a supine position "to be given that drug in his state was just as contraindicated, shouldn't be done." Walman added:

"In his present disability, he would get in trouble with that medicine. I think if they had known him better, they wouldn't have done it or at least known how to handle it. It could have been used if they decided to breathe for him ahead of time. They didn't. He was breathing on his own and couldn't breathe after that."

The *fifth* breach, said Dr. Walman, was in Nurse Sergott having to leave appellant to consult with Dr. Lee. Sergott himself didn't understand appellant as well as he should have, and "for him to leave this patient even in the hands of

---

**2.** Nurse Sergott, it appears, grossly underestimated the potency of Sublimaze. He testified that "[o]ne cc of Sublimaze or two cc's of Sublimaze is equivalent to ten milligrams of morphine." According to the 1989 Physician's Desk Reference (PDR), p. 1053, one-tenth of a milligram of Sublimaze is given in a two-cc solution. Thus, Sergott seemed to equate one milligram of Sublimaze with 10 milligrams of morphine, rather than 100 milligrams of morphine. Based on Dr. Walman's testimony, which is consistent with the PDR, Sublimaze is 10 times more potent than Nurse Sergott believed it to be.

another nurse anesthetist, to have to go and talk to the doctor about what he should do next is not a good standard of care." It is all right, Dr. Walman stated, "to transfer care of a patient to another person equally qualified as yourself, but the nurse who came in couldn't have possibly understood [appellant] as well as she should have for his problems."

After having discussed each of these deficiencies, Dr. Walman was asked his opinion as to whether those breaches were a direct and proximate cause of appellant's injuries. He stated: "My opinion is that the five different categories that I outlined led to each one of them in a way and certainly altogether the event in the operating room, whereupon Mr. Franklin had a cardiopulmonary arrest, had to be resuscitated."

Asked then what harm resulted from these breaches, Dr. Walman opined that

"the events which occurred led to him being first of all very near death at one point, having to spend a day and a night in the intensive care unit which was not planned for the surgery, having to spend a total of five days in the hospital instead of leaving the hospital shortly after the surgery, never having the problem with his hand fixed."

Having given the general opinion as to causation, Dr. Walman was asked to examine each of the five deficiencies and its causal impact. As to the first, he said:

"[I]f a more complete pre-evaluation had been done ... a better understanding of Mr. Franklin's problems would have been had, and the arrangements for anesthesia as to what was done, and when it would be done, I think would have been different. And therefore the events would not have occurred, or would have been less likely to have occurred, much less likely."

A similar response was given with respect to the lack of communication between Dr. Lee and Nurse Sergott—that had there been communication, Sergott would have had a better understanding of appellant's problems and "would

not have had to consult with the anesthesiologist in another room, so I think this was a causative feature of the crisis that occurred in the operating room." As to Dr. Lee's absence—the third deficiency—Dr. Walman said:

"Yes. Once again, had Dr. Lee been available to the patient, he would have likewise been available to the nurse who was with the patient, and the events, I think, would have been much less likely to have occurred, because they would have been able to make a plan when the block initially failed and decide on what drugs to use."

Dr. Walman was then asked about the effect of the administration of three cc's of Sublimaze—the fourth deficiency noted by him. Though the doses were given incrementally, Dr. Walman said that the time period during which they were given was short enough that all "or a significant portion of that drug was given in his body at some point." In the short period of time the doses were given, he asserted, "it had a serious effect." More particularly, he testified:

"I think that the drugs, the narcotics that were used are really the final straw. They are the straw that broke the camel's back, if you will, of what happened, the suppine [*sic*] position or lying flat on his back, other medications that he was given that were still in his body, the lack of planning for any other form of anesthesia, and the giving of the drugs, just topped everything off, and pushed him over the edge into that crisis, that crisis was caused really by the narcotics."

As we indicated, Dr. Walman testified briefly as to the harm to appellant resulting from what occurred, alluding to his being near death at one point, having to spend extra time in the hospital (part of it in the intensive care unit), and never having the operation he came to the hospital for in the first place. Indeed, Dr. Gupta testified that, when he last saw appellant in March, 1982—eight months later—appellant was still suffering from the same condition. There was much other evidence as to injury as well, most of it dealing with subsequent emotional trauma and behavioral

changes that both professional and lay witnesses attributed to the events of July 17.

Dr. Lee and Nurse Sergott succeeded in convincing the trial court that this evidence was lacking in two critical respects—that Dr. Walman never established what the standard of care was as to some of the five deficiencies and that it was never shown that the outcome would have been any different had Lee and Sergott done all of the things Dr. Walman claimed they should have done. They press the same arguments in the appeal. Unlike the trial court, we are not convinced.

■ Dr. Walman did not suggest that the mishap was attributable solely to any one of the five deficiencies he found, to the exclusion of the others. The thrust of his testimony was that they were cumulative in their effect. He made clear, as clear can be, that Lee and/or Sergott should have recognized that appellant presented an unusually high risk (ASA IV) and that they should not have proceeded without more specific pre-operative tests, some of which he named specifically. That stated a standard of care as well as its breach. The effect of that breach was that neither of them knew enough about appellant to be prepared for what occurred—what, given appellant's obesity and breathing problems, could have been anticipated.

That aspect of the problem was exacerbated by the lack of any written or oral communication between Lee and Sergott, the effect of which was to allow Sergott alone to choose the anesthetic agent, the analgesic agent, and their dosages. The former was clearly insufficient; it failed to anesthetize the arm; the latter proved to be too much.

■ Lee and Sergott complain that, while critical of the drug and dosage given by Sergott, Dr. Walman never said what drug and dosage *should* have been given. It is that omission, they urge, that represents both a failure to state the applicable standard of care and a failure to establish a foundation for showing that the mishap would not have occurred if the anesthesia had been handled differently.

Under the circumstances here, Lee and Sergott demand too much. This is not at all like *Lane v. Calvert, supra,* 215 Md. 457, 138 A.2d 902, upon which they rely. The alleged negligence there arose from post-operative care—the failure to use a particular test, ultimately used successfully to locate and drain pus accumulations resulting from the surgery, earlier in the post-operative period. The problem in that case was that the plaintiff's expert witness never testified as to *when* a physician of reasonable skill would have used the test in light of everything else that the defendant doctor had done.

That is not the case here. Dr. Walman made very clear what should have been done. The failure to do these things led to "the event in the operating room." Had there been proper pre-operative testing and assessment, Lee and Sergott would have had a better understanding of appellant "and the arrangements for anesthesia as to what was done, and when it would be done, I think would have been different." Thus, Walman concluded, "the events would not have occurred, or would have been less likely to have occurred, much less likely." We find that sufficient.[3]

With the evidence we have recounted and that to which we have only alluded, the argument that appellant failed to prove any injury caused by the negligence of Lee and Sergott is simply ludicrous.

For these reasons, we conclude that the court erred in entering the judgments NOV.

---

3. Curiously, the trial court itself acknowledged the legal sufficiency of Dr. Walman's testimony in at least one respect. After sustaining a defense objection to a certain line of questioning of Dr. Walman, the court remarked:

"Now, I don't think you're left naked in this regard. Because, as I indicated a few moments ago, Dr. Walman testified yesterday that it is only proper for a physician to prescribe any narcotic, and obviously it was not done, so you certainly can argue to the jury that Dr. Walman has testified as to the proper standard of care, and that the evidence is uncontradicted that this was violated, so I think you've got what you want, really."

## III. NEW TRIAL—REMITTITUR

In reviewing the conditional grant of a new trial, we apply a wholly different standard than that governing judgments NOV. Whether the case is civil or criminal, the law has long been and remains today that the decision to grant or deny a timely motion for new trial is a discretionary one. This is true as well to the granting or refusal to grant a remittitur. *Conklin v. Schillinger,* 255 Md. 50, 257 A.2d 187 (1969); *Banequra v. Taylor,* 312 Md. 609, 541 A.2d 969 (1988). In many cases, the Court of Appeals has actually held that such a decision is not even appealable. See cases cited and quoted in *Kirsner v. State,* 296 Md. 567, 463 A.2d 865 (1983). The better, and more recently expressed, view is that the grant of a new trial is appealable, but because of the broad range of discretion accorded the trial judge, the decision is reviewable, on an abuse of discretion standard, only "under extraordinary circumstances." *Banequra v. Taylor, supra,* 312 Md. 609, 624, 541 A.2d 969, quoting in part from *State, Use of Shipley v. Walker,* 230 Md. 133, 137, 186 A.2d 472 (1962); *see also Mack v. State,* 300 Md. 583, 479 A.2d 1344 (1984).

Here, we must look at all of the evidence, not just that favoring the plaintiff. The principal injury claimed by appellant was his subsequent emotional reaction to what occurred. Considering his delicate physical and mental condition before the occurrence, along with the fact that the nature, extent, and proximate cause of appellant's posttraumatic complaints were seriously contested by the defendants, we decline to hold that the trial judge abused his discretion in finding the jury's verdict unreasonable in amount.[4]

---

**4.** Appellant urges that, by seeking a new trial as an alternative to their motion for judgment NOV, Sergott and the hospital somehow waived their right to the new trial and to the remittitur. We find no merit in that argument. The two remedies are mutually inconsistent. A defendant cannot get both. We see no impropriety in seeking the more favorable remedy—the judgment NOV—and also asking for the remittitur/new trial in the event, for any reason, the judgment NOV is

## IV. JURY INSTRUCTIONS

### A. *What Was Asked and What Was Given*

At the close of the evidence, appellant submitted a number of proposed jury instructions, among which were Nos. 11 and 12.

Proposed Instruction No. 11 was captioned "Responsibility and Liability of Surgeon—the Captain of the Ship Doctrine." The relevant part of it is as follows:

"While Mr. Franklin was being prepared to undergo surgery, Dr. Gupta, the surgeon, is ordinarily regarded in law as having the exclusive responsibility and control over the case. Although Dr. Gupta denies any knowledge of anesthesia and asserts that he relies on the anesthesia department of the Defendant, Church Home Hospital, Corp., for all aspects of the administration of anesthesia. None the less, Dr. Gupta admitted it was his duty to see that his patient is properly anesthetized. Dr. Gupta specifically requested that Mr. Franklin be placed under general anesthesia.

Recognizing that Dr. Gupta has exclusive responsibility and control, he can thus be held responsible for any acts of negligence committed during the operation by any nurse anesthetist or assisting physician who is under his direction, no matter whether or not such assistant is an employee of Church Home Hospital. For the purposes of the surgery, nurse Sergott and the other members of the operating room staff are referred to as 'borrowed servants' for whose acts the surgeon and the employer (the Church Home Hospital) must be responsible. If you find from the evidence in this case that the injury which is the subject of this action was due to the act of a person other than Dr. Gupta, but who was under his direction, supervision and control, you must find Dr. Gupta liable.

. . . . .

---

either not granted or, if granted, is reversed or vacated on appeal. To seek both, in this circumstance, is not a waiver of either.

In determining whether Dr. Gupta is in charge of the operation, which is the subject of this action, or the failure of Dr. Lee to act, it is your duty to determine from the testimony whether nurse Sergott, was under Dr. Gupta's supervision or control. This would include a duty on the part of Dr. Gupta to cancel or postpone the surgery until such time as Dr. Lee or another anesthesiologist was present to care for Mr. Franklin."

Proposed Instruction No. 12 had principally to do with the vicarious liability of the hospital for the negligence of nurse anesthetists and physicians employed by it. The proposed instruction also contained this statement, however:

"Additionally, any nurse anesthetist who commits a negligent act in the presence of a physician would render the physician liable for their acts should you find that acts directly caused, or contributed to cause the injuries and damages complained of. In such case, your verdict should also be against the Defendant physician."

The court declined to give either of these instructions. Indeed, it said nothing about any vicarious liability on the part of Dr. Gupta for the acts or omissions of Dr. Lee or Nurse Sergott. Instead, it told the jury, in relevant part that:

"[T]he standard of care governing the acts of each of the defendants is ... that degree of care and skill which is required of a reasonable practitioner in the same class, to which the particular defendant belongs, acting in the same or similar circumstances...."

. . . . . .

Thus, Dr. Gupta is to be judged in his capacity as a surgeon. Dr. Lee is to be judged in his capacity as an anesthesiologist; and Mr. Sergott is to be judged in his capacity as a certified, registered nurse anesthetist.

Paragraph E: In order to establish medical malpractice or negligence, the plaintiff must prove to you, by a preponderance of the evidence, the following separate issues:

With regard to Dr. Gupta, the standard of care required of a surgeon under the same or similar circumstances."

Later in its instructions, the court told the jury that "there has been no claim in this case that Dr. Gupta deviated from the accepted standard of care in suggesting that Mr. Franklin be given general anesthesia. Therefore ... you may not consider that in determining whether or not Dr. Gupta is liable to Mr. Franklin for damages in this case."

## B. Preservation

We are unable to find any pertinent exceptions by appellant to these particular instructions. At one point, he lodged an exception to "Your Honor instructing that Dr. Gupta's deviation with regard to anesthesia" on the ground that "[i]t has not been in evidence, in this case, one way or the other," but that does not go to the issue now before us. Appellant excepted to the court's failure to give certain of his requested instructions, including proposed Instruction No. 11; no exception was made to the omission of proposed Instruction No. 12, however. Dr. Gupta urges that any complaint about the failure to give that instruction has therefore been waived. He is correct, of course, but because the particular paragraph of that proposed instruction at issue here is, to some extent, a partial paraphrase of proposed Instruction No. 11, the waiver is of no real consequence. The issue of Dr. Gupta's vicarious liability for the negligence of Dr. Lee and Nurse Sergott is properly before us.

## C. Error Vel Non

Although, as we observed, Dr. Walman opined as to five separate, but interrelated, standards of care breached by Dr. Lee or Nurse Sergott, neither he nor any other expert witness asserted any direct negligence on the part of Dr. Gupta. Nor did Dr. Walman or any other expert witness assert, as a matter of standard medical or hospital practice,

that Dr. Gupta, as the surgeon employed to operate on appellant's wrist, had the expertise, the duty, or the right to supervise or control the method of anesthesia, the agents used to achieve the anesthesia, the dosages of those agents, the pre-operative examination and evaluation of appellant by Lee and/or Sergott, the extent of communication and collaboration between them, or the precise manner in which Sergott conducted himself in the holding area and in the operating room.[5] There was no evidence that Dr. Gupta actually exercised, or attempted to exercise, any such supervision or control. Proposed Instruction No. 11, then, was not based on any factual predicate but on an assumed principle of law.

The principle underpinning the instruction has become popularly—and sometimes erroneously or misleadingly—called the "captain of the ship" doctrine. As explained in *Thomas v. Raleigh General Hosp.*, 358 S.E.2d 222, 224 (W.Va.1987): "Under this doctrine, a surgeon is likened to the captain of a ship, in that it is his duty to control everything going on in the operating room. Thus, liability is imposed by virtue of the surgeon's status and without any showing of actual control by the surgeon." *See also* Leff, *The Leff Dictionary of Law: A Fragment*, 94 Yale L.J. 1855, 2249 (1985).

As pointed out by Price, *The Sinking of the "Captain of the Ship"*, 10 J. Legal Med. 323 (1989), this "Captain of the Ship" doctrine is but one of several theories of vicarious liability on the part of hospitals and surgeons for acts of negligence committed in the operating room. It is helpful, in examining the doctrine, to consider its context, its purpose, its scope, and how the courts have dealt with it.

---

**5.** Dr. Gupta asserted, without contradiction, that it was the anesthesiologist's function to take care of the anesthesia and that he was not present when the brachial block was administered. He conceded only that it was part of his duty to see that the patient is properly anesthetized before beginning to operate.

 A hospital, like any "master" or employer, is liable under agency principles for the negligence of its servants or employees. That would include nurses, physicians, and other medical and non-medical personnel employed by it. Until fairly recently, however, in Maryland and in many States, this vicarious liability under agency law was of little assistance to plaintiffs injured by malpractice because of the eleemosynary (or governmental) immunity enjoyed by most hospitals. *See Perry v. House of Refuge,* 63 Md. 20 (1884); *Howard v. South Balto. Gen. Hosp.,* 191 Md. 617, 62 A.2d 574 (1948); Annotation, *Immunity of Nongovernmental Charity From Liability for Damages in Tort,* 25 A.L.R.2d 29 (1952), superseded, *Tort Immunity of Nongovernmental Charities—Modern Status,* 25 A.L.R.4th 517 (1983); Annotation, *Immunity From Liability for Damages in Tort of State or Governmental Unit or Agency in Operating Hospital,* 25 A.L.R.2d 203 (1952).

 Whether for that reason or whether because hospitals in earlier days were regarded less as comprehensive health care providers in their own right than as "innkeeper[s], providing a facility for patients to be treated by their privately retained physicians" (Price, *supra,* 10 J. Legal Med. at 340), courts began to impose liability on the surgeon for what went on in the operating room. The first theory employed was the traditional "borrowed servant" doctrine now expressed in *Restatement (Second) of Agency* § 227.[6] The notion was that the surgeon acted as a special employer who borrowed nurses and other attendants from their general employer—the hospital—and thus became liable for their negligence. *See, in general,* Annotation, *Liability of Operating Surgeon for Negligence of Nurse Assisting Him,* 12 A.L.R.3d 1017, 1021–24 (1967). Liability under that doctrine, of course, requires a showing that the

---

**6.** "A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others."

surgeon actually controlled or had a right to control the details of the servant's conduct. See *Restatement (Second) of Agency, supra,* § 227 comment a; also § 220(1) and (2)(a); *Dippel v. Juliano,* 152 Md. 694, 137 A. 514 (1927); *Hunner v. Stevenson,* 122 Md. 40, 89 A. 418 (1913).

In *McConnell v. Williams,* 361 Pa. 355, 65 A.2d 243 (1949), the Pennsylvania Court essentially applied that doctrine, but in doing so it likened the surgeon to the captain of a ship. Unfortunately, that simile came to receive more attention than the actual holding in the case.

The defendant was an obstetrician employed to attend the plaintiff during her pregnancy. The delivery, by Caesarian section, was a difficult one. When the baby was removed from the womb, the defendant handed her to an intern to tie the cord and administer silver nitrate to the eyes. The intern performed the latter task negligently; he put too much solution in the eyes and failed to irrigate, thereby causing severe damage to the child's eyes. The intern was a hospital employee but had been designated by the obstetrician to assist. The action against the obstetrician was based solely on a theory of vicarious liability for the intern's negligence. At the time the case reached the Pennsylvania Supreme Court, the hospital enjoyed charitable immunity and therefore could not be made to answer for the intern's negligence.

Unlike most cases, the obstetrician acknowledged in his testimony that his liability "was to continue until the baby was turned over to the family doctor" and that "he had complete control of the operating room and of every person within it while the operation was in progress." *Id.* 65 A.2d at 246. It was in that light that the Court, after reciting the general law relating to borrowed servants, including the requirement of control, made the statement that

"it can readily be understood that in the course of an operation in the operating room of a hospital, and until the surgeon leaves that room at the conclusion of the operation ... he is in the same complete charge of those who are present and assisting him as is the captain of a

ship over all on board, and that such supreme control is indeed essential in view of the high degree of protection to which an anaesthetized, unconscious patient is entitled...."

*Id.* (footnote omitted).

The actual conclusion of the Court, which followed this discussion, was that:

"*If, then, it be true that defendant had supervisory control and the right to give orders to the interne in regard to the very act in the performance of which the latter was negligent,* it would follow, *according to the classical test of agency hereinbefore stated,* that a jury would be justified in concluding that the temporary relationship between defendant and the interne was that of master and servant, and that consequently defendant was legally liable for the harm caused by any negligence on the part of the interne."

*McConnell, supra,* 65 A.2d at 246 (emphasis added).

Contrasting cases like *Hunner v. Stevenson, supra,* 122 Md. 40, 89 A. 418, involving negligence in the post-operative care of the patient, the Pennsylvania Court held that

"the period of the operation itself ... is entirely different, and if operating surgeons were not to be held liable for the negligent performance of the duties *of those then working under them,* the law would fail in large measure to afford a means of redress for preventable injuries sustained during the course of such operations."

*Id.* 65 A.2d at 247 (emphasis added).

*McConnell* is sometimes credited with having spawned a new "separate and independent concept of agency" in hospital settings. Price, *supra,* 10 J. Legal Med. at 331. That may be giving *McConnell* too much credit. For one thing, the Pennsylvania Court never espoused the doctrine as a new concept of agency. In *Thomas v. Hutchinson,* 442 Pa. 118, 275 A.2d 23, 27 (1971), the Court explained:

"Briefly summarized, the 'captain of the ship' doctrine imposes liability on the surgeon in charge of an operation

for the negligence of his assistants *during the period when the assistants are under the surgeon's control,* even though the assistants are also employees of the hospital. Stated differently, *the 'captain of the ship' concept is but the adaptation of the familiar 'borrowed servant' principle in the law of agency to the operating room of a hospital."*

(Emphasis added.) *See also Tonsic v. Wagner,* 458 Pa. 246, 329 A.2d 497 (1974).

For another, the *McConnell* Court made clear that the issue of control by the surgeon was one of fact, not of law. In its concluding paragraph, it said that "[i]t is for the jury to determine whether the relationship between defendant and the interne, at the time the child's eyes were injured, was that of master and servant." 65 A.2d at 48.

Some courts that seemingly have made surgeons strictly liable for the negligence of others in the operating room, or that have used the expression "captain of the ship," have in reality done nothing more than apply *res ipsa loquitur* or a doctrine of negligence *per se* to the physician. Most of these cases involved the leaving of sponges or other foreign substances in the body, and the court adopted the view that, in such circumstances, negligence *on the part of the surgeon* can be inferred from the mere happening of the event. The surgeon's negligence, in other words, was direct, not vicarious. References in these cases to the "captain of the ship" are usually in the context of rejecting as a defense to such inferred negligence that the surgeon relied on an erroneous sponge count by the nurse. *See, in this regard, Rudeck v. Wright,* 218 Mont. 41, 709 P.2d 621 (1985); *Burke v. Washington Hospital Center,* 475 F.2d 364 (D.C. Cir.1973); *Ales v. Ryan,* 8 Cal.2d 82, 64 P.2d 409 (1936); *see also Shannon v. Jaller,* 6 Ohio App.2d 206, 217 N.E.2d 234 (1966); *Ybarra v. Spangard,* 25 Cal.2d 486, 154 P.2d 687 (1944).

In summary, a careful analysis of the cases cited as "captain of the ship" cases generally reveals that the court has applied traditional agency concepts and that, where the

surgeon has been held liable, the liability has either been direct (even if inferred) or based on evidence that the negligent actors were, in fact, under his direct supervision and control. As in *McConnell,* the rhetoric often tends to obscure the factual underpinning of the holding.[7] *See Beadles v. Metayka,* 135 Colo. 366, 311 P.2d 711 (1957).

To the extent that the doctrine *is* regarded as an expansion of the traditional borrowed servant rule, most courts have either expressly rejected it or have declared it inapplicable when the negligent actor is an anesthesiologist or nurse anesthetist. Two theories have been advanced for the rejection or limitation. The first was well expressed in *Thomas v. Raleigh General Hosp., supra,* 358 S.E.2d 222, 225:

"We reject the captain of the ship doctrine. The trend toward specialization in medicine has created situations where surgeons do not always have the right to control all personnel within the operating room.... An assignment of liability based on a theory of actual control more realistically reflects the actual relationship which exists in a modern operating room."

For cases espousing this view with particular reference to anesthesiologists or anesthetists, see *Dohr v. Smith,* 104 So.2d 29 (Fla.1958) and *Vargas v. Dulzaides,* 520 So.2d 306

---

**7.** The Texas Court in *Sparger v. Worley Hospital, Inc.,* 547 S.W.2d 582, 584 (Tex.1977), put its judicial finger on the problem:

"Similes sometimes help to explain a factual situation, but in legal writing, phrases have a way of being canonized and of growing until they can stand and walk independently of the usual general rules. Mr. Justice Frankfurter once wrote concerning such phrase-making in judicial opinions: 'The phrase ... is an excellent illustration of the extent to which uncritical use of words bedevils the law. A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula, undiscriminatingly used to express different and sometimes contradictory ideas.' *Tiller v. Atlantic Coast Line R. Co.,* 318 U.S. 54, 68, 63 S.Ct. 444, 452, 87 L.Ed. 610 (1943). The result in the use of captain of the ship is that a surgeon or physician may be held liable, not as others upon the basis of the general rule of borrowed servant, but as captain of the ship."

(Fla.App.1988), concluding that, while a surgeon may be liable "for the acts of assisting personnel as the 'captain of the ship,'" he or she "will not be liable for the negligence of a fellow specialist such as an anesthetist or an intern." 520 So.2d at 307; *Starnes v. Charlotte–Mecklenburg H. Auth.*, 28 N.C.App. 418, 221 S.E.2d 733, 738 (1976) ("Absent some conduct or situation that should reasonably place the surgeon on notice of negligent procedure, we think the surgeon is entitled to rely on the expertise of the anesthetist"); *Kemalyan v. Henderson*, 45 Wash.2d 693, 277 P.2d 372 (1954); *Sesselman v. Muhlenberg Hospital*, 124 N.J.Super. 285, 306 A.2d 474 (1973); *Hughes v. St. Paul Fire & Marine Ins. Co.*, 401 So.2d 448 (La.App.1981). Compare *McCullough v. Bethany Medical Center*, 235 Kan. 732, 683 P.2d 1258 (1984); also *Baird v. Sickler*, 69 Ohio St.2d 652, 433 N.E.2d 593 (1982), where, though rejecting the "captain of the ship" doctrine as "abjectly discredited" and "prostrate," the Court nonetheless held that the defendant surgeon *could* be liable for the negligent conduct of a nurse anesthetist where the evidence showed that the surgeon "exercised and possessed" the right to control the nurse's actions and actually "participated in the administering of the anesthetic." *Id.* 433 N.E.2d at 595.

The second theory, applied by some courts, is that, with the curtailment or abolition of the hospital's charitable or governmental immunity, by statute or judicial decision, an expanded liability on the part of the surgeon is no longer necessary. In rejecting the *McConnell* language, the Oregon Court noted in *May v. Broun*, 261 Or. 28, 492 P.2d 776, 781 (1972):

"It is not presently necessary to go to such lengths in Oregon in order to find a defendant who has the ability to satisfy a judgment and to spread the loss because charitable immunity for hospitals has been abolished. It would probably be fair to say that the wave of cases holding surgeons liable on one theory or another has somewhat receded following the abandonment by many courts of

the doctrine of charitable immunity for hospitals." [8] (Footnote omitted.)

The Pennsylvania Court that started this march used this theory to call a halt to it. In *Thomas v. Hutchinson, supra,* 275 A.2d 23, the Court pointed out that the "captain of the ship" doctrine was announced before the decision discarding a hospital's immunity. Thus, it said at 27, "any willingness to characterize a head surgeon as the 'captain of the ship' in order to financially restore the patient should be clearly negated in light of [that later decision]."

Maryland ventured into these waters only once—76 years ago. In *Hunner v. Stevenson, supra,* 122 Md. 40, 89 A. 418, the defendant operated on the plaintiff, removing part of her kidney and draining an abscess between the kidney and the bowel. There was no complaint about the operation itself; the plaintiff conceded that it was performed competently. The problem arose with the after-care. In concluding the operation, the defendant inserted a "cigarette drain" leading from the kidney pelvis to the body surface. The drain was made of gauze covered with a rubberized silk; the abscess cavity was also packed with gauze. The defendant expected that the wound might continue to drain for some time.

Several weeks after the patient left the hospital, gauze began coming out of the wound—about two feet of it was removed. Then some of the rubberized silk came out. The drain itself became "offensive," and eventually the plaintiff developed a fecal fistula, pleurisy, and pulmonary tubercu-

---

8. The *May* Court also espoused the first theory, pointing out at 781:
 "Changes have also been occurring in the confines of operating rooms. Surgeons are operating more and more in a highly mechanized environment wholly created by hospitals. Much highly technical equipment, now considered necessary, is furnished by the hospital and operated by personnel which the hospital hires and trains. As a result, in most instances, a surgeon cannot actually have direct supervision or control over such equipment and the persons who operate it even when he is present, if he is going to give the concentration and attention to the surgery which his patient has the right to expect."

losis. She later sued the doctor, not for anything he did or didn't do directly, but on the theory that, as the surgeon, he was responsible for the negligence of other hospital personnel in the post-operative treatment and dressing of the wound.

The Court said as to that issue:

"At this day when it is well known that there are physicians and surgeons of special skill in particular branches of their profession, it could not safely be announced as a general rule of law, applicable to such cases as this, that a surgeon who performs an operation is liable for the negligence of other physicians, nurses or internes in hospitals in the after treatment, unless he specially undertakes such employment.... It would be unreasonable to expect such a one as the record shows the appellant to be—performing operations in five different hospitals in Baltimore, and in one at Frederick, in addition to his other practice—to continue to dress the wounds and have personal charge of the after-treatment in all cases until the patient is discharged from the hospital."

*Id.* at 58–59, 89 A. 418.

The Court noted with apparent approval a number of out-of-State cases holding a surgeon liable for leaving sponges or other objects in the patient's body at the time of the operation "whether placed by him or by another in his presence" but declared that such liability would not extend to post-operative care. *Id.* at 60, 89 A. 418. The effective holding in the case, expressed at 62, 89 A. 418, was that a surgeon "cannot be held responsible for the negligence, if any, of the hospital physicians, nurses or internes in the dressings of the wound after the operation was performed, if he did not know of or was not privy to such negligence, and it was not discoverable by him in the exercise of ordinary care...."

We are not dealing here, of course, with either a foreign object problem or post-operative care, and so *Hunner* is not controlling. From our analysis of how other

courts have dealt with the issue at hand, we reject any "captain of the ship" theory of liability. Given the statutory curtailment of a hospital's eleemosynary and governmental immunity in Maryland (Md. Health–Gen. Code Ann. § 19–354; Md. Cts. & Jud. Proc. Code Ann. § 5–401 *et seq.*) there is no socio-economic need to extend the vicarious liability of a surgeon for the negligence of hospital employees simply to create a fund for victims of malpractice. Nor is there any jurisprudential need to do so. The correct doctrine to apply is the traditional "borrowed servant" rule. Where the evidence suffices to support a finding that the surgeon *in fact* had or exercised the right to control the details of another person's work or conduct in the operating room and the other elements of the rule are satisfied, the trier of fact may find that the surgeon was the "special employer" and is therefore liable for the negligence of the borrowed servant.

That was not the case here, however. As we indicated, there was no evidence that Dr. Gupta in any way supervised or controlled, attempted to supervise or control, or had the right or power to supervise or control, the conduct and decisions of Dr. Lee or Nurse Sergott. Proposed Instruction No. 11 was therefore properly rejected.

JUDGMENTS NOV IN FAVOR OF APPELLEES LEE, SERGOTT, AND CHURCH HOSPITAL REVERSED; CASE REMANDED AS TO THEM FOR FURTHER PROCEEDINGS PURSUANT TO ORDER GRANTING REMITTITUR OR NEW TRIAL; JUDGMENT FOR APPELLEE GUPTA AFFIRMED; COSTS TO BE PAID AS FOLLOWS: ONE–THIRD BY APPELLEE LEE, ONE–THIRD BY APPELLEE CHURCH HOSPITAL, ONE–THIRD BY APPELLANT.