651 A.2d 908

**Wayne BARTHOLOMEE, et al.**

v.

**Tina CASEY, et al.**

**No. 39, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Dec. 28, 1994.

Reconsideration Denied Feb. 13, 1995.

George M. Church (Francis V. Kenneally and Church & Houff, P.A., on the brief), Baltimore, for appellant Bartholomee.

Howard J. Schulman, Baltimore, for appellant Grossman.

Scott E. Nevin (Saul E. Kerpelman, on the brief), Baltimore, for appellees.

Argued before BISHOP, FISCHER and HOLLANDER, JJ.

HOLLANDER, Judge.

In this lead paint case, appellants, Wayne Bartholomee and the personal representative of the estate of Vivian Grossman, appeal from a judgment entered in the Circuit Court for Baltimore City in favor of appellees, Tina Casey, a minor, and Michelle Robinson McDaniel, her mother and next friend. Appellees claim that Casey suffered lead poisoning from her exposure to lead-based paint at one or more residences, and that appellants, who were owners/landlords of these residences, were negligent in failing to abate the hazard.[1] After a five day trial, the jury determined that appellants were negligent and awarded damages in the amount of $225,000.

On appeal, Bartholomee and Grossman contend that the trial court erred in several respects regarding evidentiary matters and pretrial procedure, and in its denial of their motions for judgment notwithstanding the verdict.[2] In light of *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 645 A.2d 1147 (1994) and *Scroggins v. Dahne*, 335 Md. 688, 645 A.2d 1160 (1994), we shall reverse as to Bartholomee, and reverse and remand as to Grossman.

---

**1.** Originally, the complaint also sought compensatory damages based on alleged violations of the Maryland Consumer Protection Act and strict liability, as well as punitive damages. These claims, along with a claim by McDaniel for her own injuries, were dismissed prior to trial and are not at issue here.

**2.** All defendants moved for judgment notwithstanding the verdict ("JNOV"). As to defendants Max Berg and Steven Berg, individually and as KGB Associates, the trial court granted the motions. Appellees have not filed a cross-appeal challenging the court's entry of JNOV in favor of the Bergs.

## Factual Background

In order to apply properly the legal principles that govern this case, we shall review, in the light most favorable to McDaniel and Casey, the evidence adduced at trial. *Franklin v. Gupta*, 81 Md.App. 345, 354, 567 A.2d 524 (1990). Additional facts pertinent to the legal issues will be addressed as necessary in our discussion of the law.

Casey was born on June 24, 1980. At that time, McDaniel had been living with Barney Casey, Tina's father, for several months at Barney Casey's apartment. The residence, located at 726 North Carrollton Street in Baltimore City (the "Carrollton Property"), was a one-bedroom apartment on the second floor of a rowhouse that had been divided into several apartments. During Casey's first months of life, the adjacent building, 724 North Carrollton Street, was undergoing demolition and construction. Casey spent almost all her time inside the Carrollton Property, except when McDaniel took Casey to play in a park across the street, which McDaniel did as often as three times a week.

In June, 1980, Bartholomee purchased the Carrollton Property. Prior to the purchase, Bartholomee inspected the entire building with the seller; Bartholomee felt that the paint, while not fresh, did not need a new coat. He was, however, aware that Baltimore City ordinances required rental dwellings to be free of flaking, chipping, and peeling paint.

McDaniel never met Bartholomee, as Barney Casey handled all matters requiring the attention of the landlord, including complaints. Barney Casey did not testify at trial. McDaniel believed, however, that Barney Casey had complained to the landlord about the condition of the paint, although she was not present when he made his complaints.[3] Bartholomee testified that he never knew that anyone other than Barney Casey was

---

3. The parties did not execute a written lease, and no one saved a copy of any writings reflecting Barney Casey's complaints, if any such documents ever existed.

living in the apartment. He also claimed that no one ever complained to him of flaking, chipping, or peeling paint.

Bartholomee testified that he did not know whether the paint in the Carrollton Property contained lead, and he was not aware, at the relevant time, of the dangers of lead-based paint. The appellees did not present evidence that the paint in the Carrollton Property had been tested for lead content. It is undisputed that Bartholomee never received notice from the City that the Carrollton Property contained lead paint.

Between the time Bartholomee purchased the Carrollton Property and the time McDaniel and Casey moved out, Bartholomee never entered their apartment. Nor did Bartholomee or anyone else inspect the apartment or repair any chipping paint. Bartholomee ultimately sold the Carrollton Property in November, 1991.

Some time around Casey's first birthday (*i.e.,* June 26, 1981), McDaniel and Casey moved into a house rented by Melvin and Gloria Wilson, Casey's maternal grandmother and step-grandfather, located at 1951 West Fayette Street in Baltimore City (the "Fayette Property").[4] Grossman owned the Fayette Property from before 1980 until December 12, 1981. The Wilsons rented the house in 1980—well before McDaniel and Casey moved in—and they continued to rent until they purchased it in 1987.

Before renting, the Wilsons visited the premises and met Grossman there. As Grossman showed the house to the Wilsons, the Wilsons noted that it needed painting; the walls had chips, marks, and scratches. Accordingly, Grossman of-

---

4. No one who testified knew the exact date on which McDaniel and Casey moved into the Fayette Property, and testimony varied widely. In her deposition, for example, McDaniel testified that they moved "six or seven months" after Casey was born, that they moved in February of 1981, that they moved around Casey's first birthday, and that they moved sometime between one year and one and a half years after Casey was born. At trial, she testified that they moved in the summer. The other witnesses testified that McDaniel and Casey moved sometime between June and August of 1981. Finally, the Kennedy medical records indicate that McDaniel and Casey moved early in August, 1981.

fered the Wilsons a reduction of the first month's rent if they would paint the apartment, and the Wilsons agreed. Prior to moving in, the Wilsons' friends helped them paint the interior of the entire house. When they were finished, the Wilsons did not see any flaking, chipping, or peeling paint anywhere in the house. Grossman never returned to inspect the quality of the Wilson's painting.

When McDaniel and Casey moved into the Fayette Property, McDaniel noticed flaking paint around the kitchen sink and windows, falling plaster on the stairway leading up to the second floor, and peeling paint on the exterior of the house. During the first months at the Wilsons' home, Casey did not go to day care or sleep in another home. When she could, she played outside the front of the house.

The first sign of lead poisoning occurred in April, 1981. A finger-stick test, performed at the Provident Druid Children and Youth Center ("Provident"), indicated that Casey had a lead level of 34 micrograms per deciliter of whole blood ("µg/dl"). At the time, a level of 30 µg/dl was considered the upper limit of normal. As finger-stick tests were often inaccurate,[5] no one took immediate action. On August 7, 1981, when a more accurate venous sample indicated a lead level of 44 µg/dl, Provident reported Casey's elevated blood levels to the Baltimore City Health Department. However, when the Health Department sent a health inspector to the Fayette Property on August 24 and 27, 1991, Ms. Wilson refused to let the inspector enter the home.

On September 3, 1981, Casey received another finger-stick

---

**5.** Plaintiffs' expert, Dr. J. Julian Chisolm, testified that the finger-stick blood tests were notoriously inaccurate, as there was no way to avoid contamination of the sample by lead on the surface of the skin. He indicated that although these tests could reflect either a lower or a higher lead level than a simultaneous venous sample, on average they indicated a lead level approximately 5 µg/dl too high. He thus placed the greatest weight on venous blood tests taken in August 1981 and December, 1981.

test, which indicated a lead level of 38 μg/dl.[6] On September 15, 1981, after the Health Department threatened to have Casey removed from the home, the Wilsons allowed a health inspector to inspect the Fayette Property. On September 23, 1981, the Health Department sent Grossman notice that the Fayette Property contained lead. Specifically, the notice stated that lead was present in the paint on various surfaces, both inside and outside the house. Of the 28 places listed, the notice indicated that only the paint on the front exterior of the house was flaking. The notice ordered Grossman to abate the lead hazard.

By October 15, 1981, Grossman had removed all the paint up to the four-foot level by burning and scraping the paint, as she had been directed to do by the Health Department. Grossman never repainted the house. On October 28, 1981, the Health Department reinspected the property and noted that all affected areas were then in compliance with Health Department directives. Additionally, in December, 1981, a venous blood test showed Casey's lead level at 30 μg/dl. On December 16, 1981, Grossman sold the Fayette Property.

Later, on May 17, 1982, the Health Department visually inspected the Fayette Property, and did not discover any new hazards. Nevertheless, six venous blood tests taken between July 6, 1982 and January 19, 1983 indicated that Casey had lead levels between 39 μg/dl and 48 μg/dl. On August 8, 1982, Provident referred Casey to the Kennedy Institute ("Kennedy")[7] for further testing and treatment. Finally, in January, 1983, McDaniel and Casey moved out of the Fayette Property and into their own apartment at 2207 Booth Street. Casey continued to receive treatment for lead poisoning at Kennedy through June 6, 1989.

6. The Provident records indicate a level of 32 μg/dl, in contrast to the original notes taken by the field examiner, which indicate a level of 38 μg/dl.

7. Kennedy is now known as the Kennedy–Krieger Institute.

### Procedural History

On February 14, 1989, Casey and McDaniel filed suit in the Circuit Court for Baltimore City against Bartholomee, Grossman, and the owners/landlords of 2207 Booth Street. After protracted discovery, the case was set for trial on April 6, 1993. On March 5, 1993, Grossman filed a motion for summary judgment,[8] to which Casey and McDaniel responded on March 19, 1993. Grossman, in turn, filed a reply on March 24, 1993. On April 2, 1993, four years after the complaint had been filed and four days before the trial was to begin, Casey and McDaniel filed a "Supplemental Answer to Defendant's Motion for Summary Judgment," which included affidavits by Melvin and Gloria Wilson. In the affidavits, the Wilsons averred that, when they moved into the Fayette Property in 1980, Grossman knew that the exterior and portions of the interior had peeling paint, that Grossman had been notified of lead paint in the premises in September, 1981, and that the flaking and chipping paint persisted in the house even after Grossman's attempted abatement.

On April 5, 1993, at the hearing on Grossman's motion for summary judgment, Grossman orally moved to strike the affidavits as conclusory, untimely, and in direct contradiction to the witnesses' earlier deposition testimony and to plaintiffs' answers to Grossman's interrogatories. Grossman also made a motion *in limine* to exclude any testimony as to the exterior of the Fayette Property. Grossman requested either the total exclusion of the testimony as to the exterior of the property or a postponement of the trial in order for Grossman to conduct additional discovery. The judge granted the motion to strike, denied the motion *in limine,* and deferred ruling on the motion for summary judgment.

The case proceeded to trial the next day before another judge. Before impaneling a jury, Grossman renewed the motion *in limine,* again requesting either exclusion of the

---

8. Previously, summary judgment had been granted in favor of all defendants on all counts except those sounding in negligence.

testimony as to the exterior or a postponement. The judge reconsidered his colleague's earlier decision to strike the affidavits, and he reviewed the contents of the affidavits. He then denied Grossman's motion for summary judgment, motion *in limine*, and request for postponement. During the trial, Grossman repeatedly, but unsuccessfully, objected to testimony regarding the exterior of the Fayette Property, and at one time even renewed the motion *in limine*.

In appellees' case in chief, Casey and McDaniel called five witnesses: Casey; McDaniel; Melvin Wilson; Dr. Barry A. Hurwitz, an expert in the field of clinical psychology;[9] and Dr. J. Julian Chisolm, an expert in the field of pediatrics and childhood lead poisoning.[10] The court allowed Casey and McDaniel to introduce certain Kennedy records, over the objections of Grossman and Bartholomee, who had argued that the records contained hearsay outside of the business records exception.

On the third day of trial, Melvin Wilson began to testify regarding the condition of the interior of the Fayette Property following Grossman's abatement. Grossman objected, contending that, like the evidence concerning the exterior of the house, the testimony about abatement methods and post-abatement hazards directly contradicted plaintiffs' discovery responses, and should be excluded. The trial court overruled this objection, and admitted the evidence. Dr. Chisolm later supplemented Mr. Wilson's testimony, discussing the hazards of abatement methods and the causal link between the post-abatement hazards and Casey's lead poisoning.

---

9. The court refused to qualify Dr. Hurwitz as an expert in "evaluating children with lead poisoning."

10. Dr. Chisolm's testimony was taken in a deposition, and portions of that deposition were read to the jury. We note that the record does not disclose what objections any of the defendants raised with regard to Dr. Chisolm's testimony. The court heard almost all objections and argument in chambers. Although the court had marked a copy of the deposition transcript with line-by-line annotations of objections and rulings, this annotated copy is not included in the record on appeal.

At the close of plaintiffs' case, and again upon the close of all the evidence, defendants moved for judgment; the court denied all motions. The court then proceeded to instruct the jury. All parties noted numerous exceptions as to instructions given and not given. After the jury returned its verdict, each defendant moved for JNOV. The court denied the motions as to Grossman and Bartholomee.

### Issues Presented

On appeal, Bartholomee and Grossman each present several procedural, evidentiary, and substantive issues. Because these issues interconnect and overlap, we have distilled and rephrased the issues as follows:

1. Did the trial court abuse its discretion as to Grossman by admitting evidence that did not conform to plaintiffs' discovery responses?

2. Did Casey and McDaniel present sufficient evidence of appellants' negligence, including evidence of breach of duty and proximate cause?

3. Did appellees present sufficient notice to appellants of a defective condition in the premises?

4. Were the opinions of Dr. Hurwitz and Dr. Chisolm admissible as presented?

5. Did the court err in admitting the Kennedy records?

6. Did the court err in its instructions to the jury?

As to Grossman, we are of the view that the trial court abused its discretion by admitting evidence that did not conform to appellees' discovery responses. We further hold that, in light of *Richwind* and its progeny, the trial court erred in failing to grant Bartholomee's motion for judgment or JNOV. Moreover, as to both appellants, based on *Richwind,* the court erred in its instructions as to the law. For the reasons discussed below, we shall reverse as to Bartholomee and, as to Grossman, we shall reverse and remand for a new trial.

### Discussion

#### I. Discovery Issues

We begin our analysis with a discussion of Grossman's discovery disputes. Preliminarily, we note that the discovery issues are pertinent only to Grossman; our ultimate decision with respect to Bartholomee, as discussed *infra*, does not depend on the resolution of the discovery contentions.

During discovery, Casey and McDaniel submitted the following answers to interrogatories propounded by Grossman:

3. If you contend that any efforts by Defendant at the premises to scrape off and remove materials or substances containing lead or lead pigment were ineffective or incomplete, or failed to removed [sic] entirely lead or lead-based pigment, describe the facts upon which you rely in support of that contention.

Answer: *Satisfactory as far as I am concerned.* Tina was in school while the Defendant abated the premises.

6. If you contend that any abatement notice from the Baltimore City Health Department (to the effect that a housing violation had been corrected and abated or that an alleged condition containing lead-based paint was removed to the satisfaction of the Health Department) was erroneous or inaccurate, or that the alleged condition was not in fact corrected, state the facts upon which you base any such contention.

Answer: *No such contention.*

22. State those facts supporting the allegations of paragraphs 3, 4, 5, 6, 7, 9, and 10 of the Complaint [negligence count against Grossman].

Answer: The Defendant allowed loose, flaking lead based paint to remain *in the dwelling* in violation of the Housing Code Sections 702, 703, 706.

24. Describe the facts supporting paragraph 5(f) of the Complaint [failure to inspect, test, or eradicate lead paint].

Answer: The Defendant allowed loose, flaking lead based paint to remain *in the dwelling* in violation of the Housing Code Sections 702, 703, 706.

29. State those facts upon which you base any other allegations contained in the Complaint against this Defendant.

Answer: *None.*

(Emphasis added).

Casey and McDaniel never filed any supplemental answers to these interrogatories. Further, their deposition testimony was wholly consistent with the answers to interrogatories.

As we previously noted, four days before trial—the proverbial 11th hour in a case that had been pending for over four years—Casey and McDaniel filed affidavits that averred, for the first time, that when the Wilsons moved into the Fayette Property, Grossman knew that the exterior had peeling paint, that Grossman had been notified of lead paint in the premises in September, 1981, and that the flaking and chipping paint persisted in the house even *after* Grossman's attempted abatement. Grossman moved, *in limine,* for a postponement or, alternatively, for a determination barring evidence as to the exterior of the house. The trial court denied both requests, and permitted the introduction of evidence regarding the exterior paint condition.

During Melvin Wilson's direct examination, he began to testify as to the condition of the interior of the Fayette Property following Grossman's attempted abatement. Grossman objected on the grounds that, like the evidence concerning the exterior of the house, testimony about improper abatement methods and post-abatement hazards directly contradicted plaintiffs' discovery responses, and should be excluded. The trial court overruled this objection, and admitted the evidence. Later, the court permitted Dr. Chisolm to testify about abatement methods and post-abatement hazards. As a result, the jury heard considerable evidence concerning the dust created by lead-paint abatement methods available in 1981, the condition of the Fayette Property after abatement,

and a possible causal link between Casey's lead poisoning and her prolonged exposure to paint dust at the Fayette Property after abatement. In addition, in final summation, counsel for appellees argued that Grossman's negligence included insufficient abatement, as the evidence showed that the lead hazards continued to exist after abatement.

Maryland law is well settled that a trial court has broad discretion to fashion a remedy based on a party's failure to abide by the rules of discovery. *Taliaferro v. State*, 295 Md. 376, 398, 456 A.2d 29 (1983). A trial court clearly has the power to exclude evidence willfully withheld by one party in violation of properly filed discovery requests. Md.Rule 2–433(a); Hon. Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 504(C), at 235 (2d ed. 1993); Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary*, Rule 2–422, at 302 (2d ed. 1992) (hereinafter, "Niemeyer & Schuett"). *See also, Starfish Condo. Ass'n v. Yorkridge Serv. Corp.*, 295 Md. 693, 458 A.2d 805 (1983) (the exclusion of any testimony by an expert witness whose name had not been disclosed prior to trial despite clear interrogatories requesting such names is appropriate unless the court makes some other adjustment in fairness to the objecting party).

When a party's failure to supply information properly requested in an interrogatory becomes apparent early in the case, any injury to the opponent can be easily remedied by an order compelling disclosure. *See* Md.Rule 2–432(b). On the eve of trial, however, "the injury inherent in failure to make discovery is unfair surprise. It would seem that the only effective cure for this disease is preclusion of the material withheld." John A. Lynch, Jr. & Richard W. Bourne, *Modern Maryland Civil Procedure*, § 7.8(c), at 597 (1993) (hereinafter, "Lynch & Bourne"); *see also, State Roads Comm'n v. 370 Ltd. Partnership*, 325 Md. 96, 106–111, 599 A.2d 449 (1991) (by not disclosing the name of an expert who has been carefully instructed not to form an opinion until trial, the party offering the expert unfairly surprised the defendant and expert's testimony should have been excluded); Niemeyer & Schuett, *su-*

*pra,* at 302 ("Answers to interrogatories are useful to preclude use of information not disclosed in them.").

▇▇▇▇ The issue here is whether the court's failure to exclude evidence regarding the exterior of the house, the abatement methods, and/or post-abatement hazards constituted an abuse of discretion and prejudiced Grossman's defense. *See Mitchell v. Montgomery Co.,* 88 Md.App. 542, 550–54, 596 A.2d 93 (1991) (despite plaintiff's claim that witness was testifying as to fact, witness was really offering an opinion as an unqualified expert; moreover, defendant's case was prejudiced by the plaintiff's failure to identify the witness as an expert in discovery, and admission of the witness' testimony constituted reversible abuse of discretion). Such an inquiry is necessarily fact-specific.

Turning to the evidence as to the exterior of the house, we see no error. "A party seeking discovery may not expect his opponent to construe discovery requests as broadly as possible, in essence, to volunteer information beyond the request, on pain of preclusion of evidence at trial as a discovery sanction." Lynch & Bourne, *supra,* at 597 (citing *Cromwell v. Ripley,* 11 Md.App. 173, 273 A.2d 218 (1971)). The evidence as to the condition of the exterior paint may have constituted evidence pertinent to a theory of liability with regard to the interior paint, because it might support a finding that Grossman knew or had reason to know of a condition inside the house. But given the fact that the Health Department notice unmistakably stated that the paint on the exterior of the house contained lead and was flaking, Grossman could hardly claim to have been surprised by plaintiffs' desire to place that evidence before the jury. It is also unlikely that a delay for additional discovery would serve any useful purpose, as the witnesses and documents already collected would, in all likelihood, be the same as those needed to address the condition of the exterior of the house. Finally, even if Grossman did suffer some unfair surprise, Grossman has not demonstrated that she has been so prejudiced as to support a finding that the trial court abused its discretion.

In contrast, we believe the trial court abused its discretion by admitting evidence concerning the abatement methods and post-abatement conditions. In discovery, Casey and McDaniel made two significant, affirmative statements as to an entire potential theory of liability: Grossman's abatement was "sufficient," and nothing was inaccurate in the Health Department's assessment that the Fayette Property complied with all requirements after abatement. Such language can only be construed as being tantamount to a concession that the abatement procedure was legally adequate and that, at least *after* the abatement, Grossman had fulfilled any duty to Casey. If so, then evidence of the abatement procedure, hazards subsequent to the abatement, and injuries resulting from those hazards, were not probative of the negligence issue. Further, to have admitted such evidence was certainly prejudicial; we cannot say that the jury was not influenced by evidence that the hazards persisted even after abatement or that the abatement was done incorrectly. Presentation of such evidence, which flatly contradicted plaintiffs' answers to interrogatories, constituted the kind of unfair surprise that careful adherence to the discovery process was intended to avoid.

This Court is mindful of the harshness of excluding significant portions of potentially relevant testimony based on discovery failures, of penalizing a minor child due to the acts of an attorney or parent, of the pressures upon busy trial counsel, and of the virtual impossibility of postponing the case during the middle of trial. But we are equally mindful of the prejudice that may follow an opponent's failure to supplement answers to interrogatories. Under appropriate circumstances, it is the opponent who must suffer the consequences of a discovery violation. Where, as here, a party's claim or defense is substantially prejudiced by an opponent's failure to provide, in a timely manner, information in discovery, the trial court's failure to fashion at least some remedy to alleviate the resulting injury constitutes an abuse of discretion. In the middle of the trial, a postponement would have been impractical; the court should have barred introduction of such critical evidence because it was not timely disclosed in discovery. Our

determination, however, does not necessarily preclude admission of the evidence at any retrial, for Grossman could no longer claim surprise or prejudice.

## II. Sufficiency Of The Evidence

As previously noted, the trial court denied the motions for judgment and for JNOV. Bartholomee and Grossman challenge this decision on the grounds that appellees failed to meet their prima facie burden of proof with respect to two elements of the negligence claim: (1) notice to the landlord and (2) causation in fact. Grossman further contends that her entitlement to judgment or JNOV would have been even stronger if the evidence that did not conform to plaintiffs' discovery responses had been excluded.[11]

Preliminarily, we observe that a party is entitled to a directed verdict or JNOV when the evidence at the close of the case, taken in the light most favorable to the nonmoving party, does not legally support the nonmoving party's claim or defense. *I.O.A. Leasing Corp. v. Merle Thomas Corp.*, 260 Md. 243, 248–49, 272 A.2d 1 (1971); *Smith v. Bernfeld*, 226 Md. 400, 405, 174 A.2d 53 (1961). On review, this Court must assume the truth of all credible evidence and all inferences of fact reasonably deducible from it tending to sustain the decision of the trial court in favor of the nonmoving parties. If the record discloses any legally relevant and competent evidence, however slight, from which the jury rationally could have found as it did, we must affirm the denial of the appellants' motions. *Franklin v. Gupta*, 81 Md.App. 345, 354, 567 A.2d 524 (1990). If, however, the evidence as a whole does not rise above speculation, hypothesis, and conjecture, and does not lead to the jury's conclusion with reasonable certainty, then the denial of appellants' motions for judgment or JNOV was error. *Montgomery Ward & Co. v. McFarland*, 21 Md.App. 501, 513–14, 319 A.2d 824 (1974).

---

11. Evidence as to Grossman's post-abatement hazards or abatement methods, whether or not erroneously admitted into evidence, is not relevant as to Bartholomee's case.

Our analysis of the evidence presented must be considered in light of *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 645 A.2d 1147 (1994) and *Scroggins v. Dahne*, 335 Md. 688, 645 A.2d 1160 (1994). We recognize that these cases were decided after the trial and after all appellate briefs had been filed in the instant case.

A critical issue here concerns the notice that Bartholomee and Grossman were entitled to receive before they could be held liable for any failure to remove hazards from lead-based paint. Casey and McDaniel essentially raise two theories of liability: First, they contend that a violation of Baltimore City Code, Art. 13, §§ 701–08 (1983) constitutes sufficient evidence of negligence to create a jury question; second, they argue that the evidence supports the conclusion that both landlords either actually knew that paint was peeling or should have known of it in the exercise of reasonable care.

*Richwind* refutes the first theory as to the legal effect of a violation of the City Code. There, as here, the minor child and her mother claimed that the City ordinances limited the common law rules of notice; a violation of the applicable ordinances would be sufficient to impose liability, even if the landlord lacked actual knowledge or any reason to know of the violation. Relying on *Hayes v. Hambruch*, 841 F.Supp. 706 (D.Md.1994), and after examining the Code sections and the *Restatement (2d) Torts*, the Court held that the City ordinances do not alter the common law rules [12] of notice. *Richwind*, 335 Md. at 674–76, 645 A.2d 1147; *see also, Bradshaw v. Prince George's Co.*, 284 Md. 294, 302, 396 A.2d 255 (1979) ("It

---

12. The Court stated the overlap as follows:

The primary difference between the [C]ity code requirements and the common law is how the landlord obtains actual knowledge of a defective condition on the premises.... Under the common law, ... it does not appear relevant who provides the landlord with notice of a hazardous condition, as long as the landlord knows or has reason to know of the problem and has an opportunity to correct it. *Under either theory, however, the notice and knowledge requirements remain the same* no matter how the landlord obtains such knowledge.
*Richwind*, 335 Md. at 675, 645 A.2d 1147 (emphasis added; citations omitted).

is presumed that the legislative body did not intend to make any alteration of the common law other than what is plainly stated."). At common law, before a landlord could be held liable for latent hazards, the landlord must have had *actual knowledge or reason to know of the hazard,* and must have had an adequate opportunity to repair the condition. *Richwind,* 335 Md. at 673–74, 645 A.2d 1147 (citing cases).

■ *Richwind,* as amplified by *Hayes* and *Scroggins,* also addresses appellees' second theory pertaining to the issue of knowledge of a dangerous condition. The sum of these cases appears to be that in order for a landlord to have reason to know of the hazard, the landlord must be aware both that a condition is hazardous and that the condition exists on the premises.

In *Richwind,* based on its particular facts, the Court concluded that the landlords' level of knowledge was sufficient to constitute reason to know of a dangerous condition. There, one of the landlords was an attorney who had managed properties in Baltimore City for some sixteen years, knew that homes built before 1957 often contained lead-based paint, knew that chipping, flaking, or peeling lead-based paint posed a danger to children who ingested that paint, knew that the plaintiffs' house had been built before 1957, and knew—from a series of written complaints—that the paint in plaintiffs' house was peeling. The Court rejected the landlords' argument that, absent actual knowledge or reason to know that the *specific* peeling paint in question contained lead, he had no legal notice of the lead hazard. *Id.,* at 679, 645 A.2d 1147. The Court reasoned as follows:

> We agree that knowledge of the fact that older homes often contain lead-based paint, without the knowledge that the paint in a particular older home is actually peeling or flaking, may be insufficient by itself to hold a landlord liable. Based on the evidence presented, however, the jury in the instant case could have found that [the landlords] received actual notice of peeling paint on the premises and also, because of [the landlords'] knowledge about older homes

often containing lead-based paint, knew or had reason to know that the peeling paint in this house was lead-based. Upon obtaining that knowledge, the landlords knew the risk peeling lead-based paint represented to the tenant's children.

*Id.,* at 670–71, 645 A.2d 1147 (citations omitted).

*Hayes v. Hambruch* concerned almost the identical issues as appeared in *Richwind.* In *Hayes,* the mother and grandparents of the minor plaintiff had orally complained to the defendant of flaking paint in the apartment during the four years the tenants had lived there. After the child had been diagnosed with lead poisoning, the Health Department inspected the apartment and sent defendant a notice of lead paint nuisance. However, nothing in the record indicated that, *prior* to the Health Department notice, the defendant had any idea that the apartment contained lead paint. The District Court held that the evidence therefore did not amount to actual knowledge of a hazard or reason to know it existed.

"[P]aint chips, like dirt, coins, stones, or other objects that children may place in their mouths, are not in and of themselves sufficient as a matter of law to establish the dangerousness that makes an injury foreseeable and creates a duty to remedy. However, the actual or constructive knowledge that the paint chips contain a toxic substance, such as lead, combined with the actual or constructive knowledge that a child may ingest those paint chips, will create such a duty."

841 F.Supp. at 711 (quoting *Garcia v. Jiminez,* 184 Ill.App.3d 107, 132 Ill.Dec. 550, 553, 539 N.E.2d 1356, 1359 (1989)).

In *Scroggins v. Dahne,* which had been consolidated with *Davis v. Stollof,* the Court held that each defendant was entitled to summary judgment because—in contrast to *Richwind*—the plaintiffs were unable to demonstrate that the defendants had *actual knowledge or reason to know* of a lead hazard in the rented premises. In *Scroggins,* it was undisputed that the tenant never complained to the landlord about the paint. The plaintiffs claimed, however, that the child was

diagnosed with lead poisoning three days after they had complained of a hole in the wall, from which the child had been eating. They argued that the landlord should be charged with knowledge of any defect on the premises which would have been discovered had he come to repair the hole. In *Davis,* the plaintiffs were unable to produce any evidence whatsoever that the landlords knew that the paint was peeling.

Citing *Richwind,* the Court held that under those facts, neither case contained evidence sufficient to create a jury question as to actual knowledge or reason to know. With respect to the facts in *Scroggins,* the Court stated:

> The short period between when Ms. Scroggins saw her son eating the plaster and when the child was diagnosed with lead poisoning was insufficient to provide the landlord with notice and a reasonable opportunity to correct the condition. In addition, the trial judge did not err in concluding that notice of a hole in a wall on the premises did not establish a basis for concluding that the landlord had reason to know there was chipping, flaking, or peeling, lead-based paint on the premises.

*Scroggins,* 335 Md. at 693, 645 A.2d 1160 (citations omitted). In *Davis,* the Court said:

> Although [the child's mother and grandmother] indicated in depositions that at some time prior to 1984 [two years after the child's birth] there was chipping paint in the premises, both parties also stated that they never informed the landlords of this problem and that they never requested the premises be painted. Second, the interrogatory replies of the defendants show no communication from [the grandmother, the mother], or anyone else regarding paint prior to [the child]'s diagnosis.

*Scroggins,* 335 Md. at 695–96, 645 A.2d 1160 (citations omitted). In a footnote, the Court continued:

> At the summary judgment hearing, the plaintiffs argued that the fact that the premises were not painted for seven years is evidence of negligence. We note that, although paint in one location may flake in less than seven years,

paint in another location may last well beyond seven years with no signs of flaking. Therefore, we believe that the mere fact that the premises in question were not painted for seven years is not, by itself, evidence of negligence. The tenant, seeing the premises on a daily basis, is in the best position to observe flaking paint. Thus, notice of such condition is a prerequisite to recovery by the plaintiff in a negligence action.

*Id.,* n. 4 (citation to *Richwind* omitted).

Appellants also argue that McDaniel and Casey did not present sufficient evidence to permit a rational jury to find that appellants' conduct proximately caused the injuries suffered by Casey. Before examining the facts, a review of the law of causation is in order.

In general, "a plaintiff may recover only those damages that are affirmatively proved with reasonable certainty to have resulted as the natural, proximate and direct effect of the tortious misconduct." *Jones v. Malinowski,* 299 Md. 257, 269, 473 A.2d 429 (1984) (citations omitted). Where the conduct of a defendant was a substantial factor in bringing about the suffering of an injury, such conduct will be deemed to have "caused" the injury. W. Page Keeton, et al., *Prosser And Keeton On Torts,* § 41, at 266–68 (5th ed. 1984 & Supp.1988) (hereinafter, *"Prosser & Keeton "*).

The "substantial factor" rule, embodied in the *Restatement (2d) Torts,* § 431, has been adopted in Maryland in a wide variety of factual contexts. *See, e.g., Reed v. Campagnolo,* 332 Md. 226, 239–40, 630 A.2d 1145 (1993) (physician's negligence can be a substantial factor in "causing" a wrongful birth); *Owens–Illinois v. Armstrong,* 326 Md. 107, 119, 604 A.2d 47 (1992) (plaintiff must show that products supplied by the defendant was a substantial factor in causing asbestosis); *Dominion Constr. Inc. v. First Nat'l Bank of Md.,* 271 Md. 154, 163, 315 A.2d 69 (1974) (drawer's negligence was a substantial factor in "causing" the forgery). Absent proof that a defendant's conduct was a substantial factor in causing the

injuries, a defendant is entitled to judgment. *Prosser & Keeton*, § 41, at 267–70.

■■■ However, when the conduct of more than one defendant may have been a substantial factor in causing the outcome, proving the causal link between the conduct of any one defendant and the injury suffered may be impossible. In such a case, plaintiff's burden to prove causation is well expressed by *Prosser & Keeton*:

> There is one special type of situation in which the usual rule that the burden of proof as to causation is on the plaintiff has been relaxed. It may be called that of *clearly established double fault* and alternative liability. Where, for example, two defendants negligently shoot across a public highway at the same time, and the plaintiff is struck by one shot, which might have been fired from either gun, it is clear that both defendants were at fault, and that one of them, and only one, has caused the injury. Instead of dismissing the action against both for lack of a preponderance of proof against either, the courts have displayed some eagerness to find concert of action, and so permit recovery against both.
>
> In this situation the California [S]upreme [C]ourt solved the problem by placing the burden of proof on the issue of causation upon the two defendants. . . . It seems a very desirable solution where negligence on the part of both defendants is clear, and it is only the issue of causation which is in doubt, so that the choice must be made between letting the loss due to failure of proof fall upon the innocent plaintiff or the culpable defendants. *But where there is no evidence even as to where culpability lies, the hardship may be equally great upon an innocent defendant; and except in very special cases, the courts have refused to shift the burden of proof.*

Id., § 41, at 270–71 (footnotes omitted; emphasis added).

With the foregoing discussion of the law of notice and causation in mind, we turn to the case *sub judice.*

58

■ As against Bartholomee, McDaniel and Casey have failed altogether to establish a prima facie case of negligence. First, the only evidence of actual notice of flaking paint derives from McDaniel's nonspecific, hearsay testimony that Barney Casey complained to the landlord. Assuming that Barney Casey did protest the flaking paint, no one testified that Barney Casey spoke to *Bartholomee*—the second person to own the Carrollton Property while McDaniel lived there—or that Bartholomee ever learned of Barney Casey's complaints. And—like the landlord in *Hayes* and unlike the landlord in *Richwind*—even if Bartholomee knew that the paint in the Carrollton Property was flaking or peeling, *there is not a scintilla of evidence that Bartholomee knew or had reason to know that the paint contained lead.*

Additionally, the record lacks sufficient evidence from which a jury rationally could conclude that Casey's exposure to lead from the paint at the Carrollton Property was a substantial factor in causing the lead poisoning. Dr. Chisolm did not testify that Casey's exposure to lead from the paint at the Carrollton Property was in any way more significant than her exposure to lead dust from the demolition and construction next door at 724 North Carrollton. In any event, Dr. Chisolm *did* say that the effect of any exposure to lead during Casey's first year of life was "relatively minor." In sum, this evidence did not support a finding of negligence on the part of Bartholomee.

As to Grossman, in the light most favorable to appellees, the evidence supports a finding that Grossman knew the paint was peeling when the Wilsons first came to inspect the Fayette Property in 1980. But given that the Wilsons painted the house before moving in, and tried not to leave any flaking paint, Grossman's actual knowledge of the condition of the house *prior* to the Wilson's occupancy does not support a finding of actual knowledge of any *subsequently arising* conditions. In particular, Grossman's actual knowledge of the state of the premises in 1980 (before the Wilsons began to occupy the premises) has nothing to do with conditions arising in the summer of 1981, when Casey moved in.

Even assuming that the paint was in a constant state of disrepair and that Grossman knew of the condition, the record contains no evidence that Grossman knew or had reason to know that the paint in the Fayette Property contained lead until the Health Department notified her in September, 1981. Indeed, considering only the facts *before* the Health Department notice was issued, the facts against Grossman are practically indistinguishable from the facts of *Hayes.*

With respect to causation, the case against Grossman is also problematic. Dr. Chisolm's testimony regarding the effects of exposure at the Fayette Property considered Casey's entire span of residence, amounting to about a year and a half. We again note that Grossman did not own the Fayette Property during Casey's *entire* "critical period" of 12 to 36 months of age; Grossman sold the house on December 16, 1981. Grossman had no duty to Casey after Grossman sold the property and, in light of *Richwind,* no duty prior to notice of the hazard. Dr. Chisolm never opined as to the impact on Casey of exposure to lead paint between September 23, 1981 and December 16, 1981 (*i.e.,* from notice to sale). Accordingly, without expert testimony that exposure during this window, *by itself,* was a substantial causation factor of Casey's lead poisoning, the jury had to speculate as to the impact of exposure during that period—particularly as compared to the impact of exposure before Grossman received notice or after she sold the Fayette Property.

Yet, as to Grossman, we cannot say that the court should have granted a motion for judgment or JNOV; the evidentiary flaws are not entirely fatal. In contrast to Bartholomee, who never had notice, it is clear, in the light most favorable to appellees, that Grossman was on notice of lead paint in the residence for about a month prior to the abatement. As we observed earlier, at common law, a landlord must have a reasonable opportunity to make repairs once aware of a hazardous condition. But given that Grossman knew of the hazard following the City's notice, a jury could, in theory, find that Grossman did not abate quickly enough. Further, with sufficient expert testimony, the jury could determine that

Casey's exposure to lead during the one month period (between September 23, 1981 and October 15, 1981) constituted a substantial factor in Casey's lead poisoning. Of course, to establish causation, Dr. Chisolm would have to testify as to the impact of the limited exposure during the one month window. Nonetheless, we cannot now say, as a matter of law, that Grossman responded quickly enough to preclude a finding of negligence. Accordingly, the case as to Grossman must be remanded for a new trial.

### III. Jury Instructions

As previously noted, all parties excepted to various portions of the trial court's jury instructions, both as to the instructions given and those not given. We elect to address certain instruction issues, as they may resurface on remand.

In the instant case, the trial judge gave the following relevant instructions:

> The owner of land does not guaranty the safety of persons who use that land. In order to recover damages from the— a defendant or the defendants, the plaintiff must prove that the defendant or defendants were negligent and that negligence was a proximate cause of any injuries.

> \* \* \* \* \* \*

> You are instructed that the term proximate cause means that cause which in its natural and continuing sequence, unbroken by any new and independent cause, produces a result and *without which cause such result would not have occurred* and which result or some similar result would have been reasonably foreseeable by a person of ordinary care in light of all the attending circumstances.

> I tell you that the owner or a landlord *must have had knowledge of the defect or unsafe condition before the accident or injury occurred in sufficient time to correct it or to warn the tenant.* The owner is considered to have had such knowledge when the defect or unsafe condition is such that *it could or should have been discovered by the exercise of ordinary care.*

I tell you that a landlord is subject to liability for—for physical harm caused to his tenant by a condition on the premises if, and only if, the following three conditions are satisfied by a preponderance of the evidence: (1) The landlord *knows or by the exercise of reasonable and ordinary care would discover the condition* and should realize that it involved an unreasonable risk of harm to such tenant; and (2) should expect that the tenant will not discover or realize the danger or will fail to protect himself or herself against it; and (3) fails to exercise reasonable care to protect the ... tenant ... against the danger....

You are instructed that the Baltimore City ordinance and regulations require a landlord to remove lead paint once a notice for violation has been issued. I tell you that a landlord is *held to the standard as to lead paint removal as were generally known and accepted at the time of the alleged exposure and/or injuries and not to a late [sic] enhanced, revised standard.*

... Section 702 provides, "Every building and all parts thereof used or occupied as a dwelling shall, while in use or at any time when the lack of maintenance affects neighboring property, be kept in good repair, in safe condition, and fit for human habitation. Subsection [sic] 706 ... reads as follows: Captioned, "Painting. All exterior portions of a dwelling or a dwelling unit which are painted in normal practice and all portions which require painting to preserve, protect, or renovate the surface shall be painted. All such portions shall be cleaned and free of—and freed of flaking, loose, or defective surfacing material prior to painting. All interior loose or peeling wall covering or paint shall be removed, and the exposed surface shall be placed in a smooth and sanitary condition. No paint shall be used for interior painting of any dwelling, dwelling unit, room, rooming house, or rooming unit unless the paint is free from any lead pigment."

The code also, at Section 703(2)(c) of Article 13, reads as follows: "All walls, ceiling, woodwork, door, and windows

shall be kept clean and free of any flaking, loose, or peeling paint and paper."

You may determine whether the defendant or defendants in this case violated the enumerated sections of the Baltimore City Code as I've read to you. In making this decision, you are instructed that the violation of a statute which is a cause of the plaintiff's injuries is not negligence per se or conclusive proof of negligence. The violation of a statute is evidence of negligence, but not necessarily conclusive....

You are instructed that it may or may not be a violation of any statute or regulation to own or offer for rent any home or dwelling with lead paint. Whether said renting of a residence which may contain lead paint is negligence on the part of the landlord is dependent upon the facts and circumstances of each individual case.

* * * * * *

The plaintiff cannot prove that the defendants were negligent merely by showing that they failed to make a proper inspection of the properties, since *property owners are under no duty to their tenants to make such an inspection.*

I tell you that it is the law in the State of Maryland that in an action on behalf of an infant—in this case, the plaintiff, Tina Casey—that in an action on behalf of such an infant to recover for personal injury, the negligence of the parent or custodian of the infant *may not be imputed to the infant child.*

(Emphasis added).

Grossman excepted to the court's instructions regarding a landlord's duties; by saying a landlord "should have known" of a latent hazard by exercising "reasonable care," the appellant claims the court implicitly created a duty to inspect even if the landlord lacked actual or constructive notice. Grossman further excepted to the court's instruction concerning the abatement methods available at the time, as the sufficiency of Grossman's abatement had not been at issue in the case. Grossman also excepted to the court's instruction that the

parent's negligence can not be imputed to the child, and to the court's refusal to give an instruction regarding independent, superseding causation.

Grossman's complaints as to the court's instructions regarding the landlord's duties, absent notice, should have prevailed. A landlord's duty to a tenant, expressed in *Restatement (2d) Property*, § 17.1(1), at 160 (1977),[13] is as follows:

> A landlord who conceals or fails to disclose to his tenant any condition, whether natural or artificial, which involves unreasonable risk of physical harm to persons on the leased property and which exists when the tenant takes possession, is subject to liability to the tenant and others upon the leased property with the consent of the tenant or his subtenant for physical harm caused by the condition after the tenant has taken possession, if:
>
> (a) the tenant does not know or have reason to know of the condition or the risk involved; and
>
> (b) the landlord *knows or has reason to know* of the condition, realizes or should realize the risk involved, and has reason to expect that the tenant will not discover the condition or realize the risk.

(Emphasis added). *See also, Restatement (2d) Torts*, § 358(1), at 243 (1965) (nearly identical language); *Richwind*, 335 Md. at 666, 645 A.2d 1147 (citing *Restatement (2d) Torts*, § 358(1)).

The court told the jury three times that a landlord will be deemed to know of a dangerous condition if he should or would have discovered the hazard in the exercise of ordinary care. At a glance, it would seem that the court's instructions differed only slightly from the *Restatement*'s standard; they also conformed to the instructions set forth in both *Md. Civil Pattern Jury Instructions*, 24:10 (1993), and Hon. Rosalyn Bell, *Pattern Jury Instructions*, § 25.04 (1993). Neverthe-

---

13. The *Restatement* standard was adopted in *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 666, 645 A.2d 1147 (1994). As previously noted, *Richwind* was decided well after the trial, and after the appeals briefs were filed in this case.

less, as *Richwind* and its progeny make clear, the difference between the *Restatement* and the instructions in question is far more than semantic.

▮▮ The *Restatement* uses two distinct versions of "constructive" notice that are *not* interchangeable: "should know" and "reason to know." A landlord's duty depends on whether he or she has actual knowledge or "reason to know" of the hazard. *Richwind,* 335 Md. at 676–77, 645 A.2d 1147. No liability can attach merely because a landlord "should know." The Court in *Richwind* explained this important conceptual distinction:

> " 'Both the expression "reason to know" and "should know" are used with respect to existent facts. These two phrases, however, differ in that "reason to know" implies no duty of knowledge on the part of the actor whereas "should know" implies that the actor owes another the duty of ascertaining the fact in question. "Reason to know" means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist. "Should know" indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty.' "

*Id.,* at 677, 645 A.2d 1147 (quoting *State v. Feldstein,* 207 Md. 20, 33, 113 A.2d 100 (1955) which, in turn, quoted *Restatement (2d) Torts,* § 12, Comment a).

In the instant case, the court erred because a fair reading of its instruction would permit a finding of liability based on the "should know" standard soundly rejected in *Richwind.* Although the trial court correctly instructed the jury that a landlord has no duty to inspect, the jury was allowed to find negligence if Grossman "could or should have ... discovered [the paint hazard] by the exercise of ordinary care," and so the

court improperly imposed upon landlords a duty of care not required by the *Restatement* or *Richwind.*

> In order for [§ 17.1(1) ] to apply, it is not enough that the dangerous condition of the leased property is one which *might be discovered by a reasonable inspection of the property. The landlord is under no duty to his tenant, or to any other person entering the leased property, to make such an inspection....*
>
> It is not, however, necessary that the landlord have actual knowledge of the condition, or that he be in fact aware that it involves an unreasonable risk of physical harm to persons on the leased property. It is enough that he *has reason to know that the condition exists,* as that phrase is defined in § 12(1) of the Restatement of the Law, Second, Torts....

*Restatement (2d) Property,* § 17.1, Comment b, at 161 (emphasis added).

 Grossman's exception to the instructions regarding methods of abatement "generally known and available at the time" also should have been granted, on the grounds that appellees had effectively conceded (through their discovery failure) that Grossman had fulfilled any duty to Casey at least as of the time the abatement was performed.[14] In addition, there is no evidence in the record about what the actual standard at the time was, and very little evidence about the method Grossman actually used. Accordingly, this instruction was not supported either in law or in fact.

 Finally, Grossman was entitled to an instruction concerning the so-called "substantial factor" test of causation. As discussed above,[15] the "substantial factor" rule, embodied in the *Restatement (2d) Torts,* § 431, has been adopted in Maryland in a wide variety of factual contexts. *See, e.g., Reed v. Campagnolo,* 332 Md. 226, 239–40, 630 A.2d 1145 (1993); *Owens–Illinois v. Armstrong,* 326 Md. 107, 119, 604 A.2d 47

---

**14.** *See* section I, *supra.*

**15.** *See* section II, *supra.*

(1992); *Dominion Constr. Inc. v. First Nat'l Bank of Md.*, 271 Md. 154, 163, 315 A.2d 69 (1974). Nothing in these cases limits the applicability of the substantial factor test to a single factual context, such as products liability, as the trial court below had concluded. Accordingly, Grossman was entitled to an instruction on this issue.

We observe, however, that most of the contentions as to the instructions are without merit. For example, it would have been error for the trial court to instruct the jury to find in favor of Grossman based on the parents' actions.[16] Grossman has not provided evidence of acts by McDaniel sufficient to supersede Grossman's alleged negligence.

Based on our holdings, we decline to reach the remaining issues raised by appellants.

JUDGMENTS REVERSED; CASE REMANDED FOR RETRIAL AS TO GROSSMAN ONLY. COSTS TO BE PAID BY APPELLEES.

---

16. The law in Maryland is clear that the negligent acts of a parent cannot be imputed to the minor child, and that negligent acts of the parent that merely contribute to the injury do not necessarily rise to the level of superseding causation. *See Caroline v. Reicher*, 269 Md. 125, 304 A.2d 831 (1973) (even when landlord's negligence in failing to abate lead paint was "passive" and mother's negligence in failing to stop the child from eating paint was "active," the court should have directed a verdict for mother for lack of evidence that her acts superseded the landlord's acts). *See also, Suburban Trust Co. v. Waller*, 44 Md.App. 335, 347–48, 408 A.2d 758 (1979); *Restatement (2d) Torts*, §§ 447, 452.